ROBERT S. BARR, Appellee, v. W. W. CARDELL, Appellant.

**ELECTIONS:** Right of Suffrage—Regulation—Confining Elector to
1   Official Ballot—Writing in Name of Candidate. A qualified elector has the constitutional right to freely vote for whom he pleases. This right cannot be taken away or abridged by a statutory provision that, in voting, he shall choose between the candidates whose names are printed on the official ballot. *It follows that the voter has the right to write or paste upon his ballot the name of any person for whom he desires to vote.* (Sec. 2, Art. 1, and Secs. 1, 6, Art. 2, Const.)

**CONSTITUTIONAL LAW:** Construction, Etc.—Statutes Facilitating
2   Elective Franchise—Sustaining Statute. The following principles of constitutional construction are recognized:
   1. Statutes calculated to facilitate and secure, rather than subvert or impede the elective franchise, are quite generally upheld.
   2. The courts lean toward that construction of statutes which is in harmony with, rather than antagonistic to, the Constitution.

**ELECTIONS:** Non-Partisan Judicial Act—Validity—Elector's Free-
3   dom of Choice. Chapter 2-B, Code Sup., 1913, known as the Non-partisan Judicial Act, contains no attempt to restrict the elector in his right to vote at the general election for whomsoever he pleases, regardless of the names of the candidates printed on the official ballot.

**ELECTIONS:** Non-Partisan Judicial Act—Construction—"Candi-
4   dates on Such Judicial Ticket". The provision of Sec. 1087-b3, Code Sup., 1913 (being part of the Non-partisan Judicial Act), that "The candidate or candidates *on such judicial ticket* receiving the highest number of votes shall be considered elected" refers not alone to those candidates whose names are *printed* on the ticket, by virtue of a prior nomination by primary election, but to those whose names are *written* or *pasted* upon the ballot by the elector at the time of voting at the general election.

**JUDGES:** Qualifications—"Practicing Attorney". One who has
5   been duly admitted to practice law and holds himself out to the public as an attorney at law and is rendering such service as comes to him in a professional way is a "practicing attorney", within

the meaning of Sec. 257, Code, 1897, providing the qualifications of judges of the superior courts. The extent of "practice" is not determinative.

*Appeal from Dallas District Court.*—LORIN N. HAYS, Judge.

THURSDAY, DECEMBER 16, 1915.

THIS is a contest to ascertain who was elected superior judge by the voters in the city of Perry, November 3, 1914. Robert S. Barr was the only candidate for nomination at the primary in June preceding and, of course, was duly nominated and his name printed in the non-partisan judicial ticket on the ballot used at the election. He received 214 votes. The name of W. W. Cardell was written in such ticket by the electors, and in that way 440 ballots were cast for him, Cardell was declared by the board of supervisors, acting as canvassers, to have been elected. Barr filed with the county auditor his statement of intention to contest, and a court was organized, as provided by Sec. 1201 of the Code, for the trial of contested county elections. The grounds of contest were: (1) that the incumbent was not a practicing attorney at law at the time of said election; and (2) that he was not nominated at the primary election, and, for this reason, was not eligible, and votes cast for him by writing in his name might not be counted. The incumbent challenged the jurisdiction of the court of contest, for that, as was alleged, the office of superior judge is not a county office; and he also asserted that Barr was not a resident of Perry. The incumbent, Cardell, was held to have been elected and the cause carried to the district court. It decided in favor of the contestant, Barr, and Cardell has appealed to this court.—*Reversed.*

*John B. White, Harry Wifvat, Parsons & Mills* and *Dugan & Dugan,* for appellant.

*H. G. Giddings* and *E. J. Kelly,* for appellee.

LADD, J.—At the general election of 1914, Robert S. Barr was candidate for the office of superior judge in the city of

Perry and, as he had been nominated at the preceding primary, his name was printed on the non-partisan judicial ticket. He received 214 votes. W. W. Cardell had not been nominated, but many electors wrote his name on the ballot, and in this way he received 440 votes. Barr contends that, even on this showing, Cardell is not entitled to the office; for that only those nominated at the primary are eligible to election, and relies on Chapter 2-B of Title VI of the Code Supplement, 1913. Cardell insists that such a construction would render the act unconstitutional and, for this reason, should be avoided if it will bear a construction such as will permit electors to insert names of persons of their choice. Sec. 1087-b thereof provides:

"That from and after the passage of this act, all candidates for the office of judge of the supreme, district and superior court, in the state of Iowa, shall be nominated at the regular primary election, and elected at the general election in November, in the manner hereinafter provided."

The section following prescribes how persons may become candidates for supreme, district or superior judge at the primary and declares that a person desiring to become a candidate for the office of superior judge shall file in the office of the auditor of the county in which the court is located a petition to that effect, signed by 250 qualified electors of the municipality in which said court has been established.

Sec. 1087-b2 directs that the ticket entitled "non-partisan judicial ticket" be printed on the ballots of each political party without party designation, and some other matters not relevant to the issue.

"Sec. 1087-b3. At the general election in November there shall be placed on the ballots a separate ticket entitled 'non-partisan judicial ticket', upon which shall be placed the names of the candidates nominated for judges of the supreme court, district, or superior courts in the state, and in the several districts and cities who have been nominated as herein provided. The names of all candidates shall be placed on said ticket and in the same order as far as possible as other candidates and

with the same provisions with reference to alphabetical rotation and the number of candidates for each office to which the elector is entitled to vote. The candidate or candidates on such judicial ticket receiving the highest number of votes shall be considered elected."

"Sec. 1087-b4. The method of withdrawal, filling vacancies, conducting such primary and general elections, of preparation of the ballot, of canvassing the vote, of announcing the result, of recounting the ballot, of publishing notice of nomination and election, and the penalty for the illegal voting, misconduct of the election officials, and the making of the sworn return of nomination and election expenses, shall, so far as applicable, be the same as now provided for the regular primary and general election laws of Iowa."

The last section thereof repeals all acts or parts of acts inconsistent therewith.

I. The manifest design of the legislature was to eliminate all considerations of partisanship in the selection of candidates for the office of judge at the primary and the subsequent election. To effect this purpose, the ticket is designated "non-partisan" and the names placed on the ticket without party designation, and even the ticket is placed by itself on the ballot. The word "ticket" has no well-defined meaning, there being many varieties; but as here used, it evidently has reference to the list of candidates for nomination to the office of judge, at the primary, and thereafter, to those nominated to be submitted to the voters at the general election. These tickets are to be printed on the respective ballots, such as provided by the primary and election laws. The several provisions relate to the nomination of candidates, the printing of the ticket and the like, but have no reference to the exercise of the right of franchise by the elector. Neither the method to be pursued nor the object to be attained is necessarily inconsistent with unlimited freedom on his part in the selection of those for whom he will vote. Our Constitution declares that "All elections

1. ELECTIONS: right of suffrage: regulation: confining elector to official ballot: writing in name of candidate.

by the people shall be by ballot." How this ballot shall be prepared and cast and all matters relative to the manner and place of elections are left to legislative regulation. The problem always is how best to conserve the purposes of popular government. The objects exacting most attention are the exclusion of unqualified persons and shielding the elector from the influences of coercion and corruption. So long as the statutes enacted are calculated to facilitate and secure, rather than subvert or impede the right to vote, they are quite generally upheld. *State v. Black,* (N. J.) 16 L. R. A. 769; *Cole v. Tucker,* (Mass.) 29 L. R. A. 668. Such statutes, in so far as tending to limit the elector in exercising the right of franchise, are to be construed liberally in his favor. *Salcido v. Roberts,* (Cal.) 67 Pac. 1077; *Eckerson v. City of Des Moines,* 137 Iowa 452. And, too, courts lean toward that construction of statutes which is in harmony with rather than antagonistic to the Constitution. *Rowley v. Clarke,* 162 Iowa 732. To deny the elector the right to vote for any other than names printed on the ballot would be, according to the weight of authority, inconsistent with that freedom of choice accorded him by the Constitution. Sec. 2 of Article 1 thereof declares that "all political power is inherent in the people." This is tantamount to saying that such power exists in those who, under the Constitution, are privileged to exercise the elective franchise. Cooley, Constitutional Limitations (7th Ed.) p. 57. Certain classes are excluded from such privilege, in prescribing the qualifications of those who may exercise it. Concerning the propriety of these qualifications, differences of opinion may exist. That qualifications of some kind, definite in terms and easy of application, should be required, all agree. The aim generally in accomplishing this has been not to limit the right of suffrage to the wisest or purest or best educated or to those with property, but to extend it to the ignorant as well as to the learned, the poor as well as the rich, irrespective of character, to the end that all shall

2. CONSTITU-
TIONAL LAW:
construction,
etc.: statutes
facilitating
elective fran-
chise: sustain-
ing statute.

participate in governing; and this on the broad principle that "the best government for mankind is not the government which the wisest and best would select, but which the average man would select."

Sec. 1 of Article 2 provides that "Every male citizen of the United States, of the age of 21 years, who shall have been a residence of this state six months next preceding the election, and of the county in which he claims his vote, sixty days, shall be entitled to vote at all elections which are now or hereafter may be authorized by law."

These qualifications may not be modified by the legislature, but are alone determinative of the right of suffrage. *Coggeshall v. City of Des Moines,* 138 Iowa 730. And the principle is fundamental that, unless otherwise specially provided, none but qualified electors can hold elective offices. *State v. Van Beek,* 87 Iowa 569.

Upon the qualified electors, then, is conferred all political power, and this must be exercised through the ballot. If the electors are to exercise such power, if their will is to be expressed and effective, the ballot must be free and unhampered; otherwise, the legislature may, by restrictions as to candidates for office or methods of nomination, deprive the electors of exercising the political power declared to be inherent in the people. Any limitation of their right to vote for any person eligible to office for such office would be inconsistent with that governmental power conferred upon the electors. Says Judge McCrary, in his work on Elections (4th Ed.), Sec. 700:

"The statutes of most of the states expressly permit the voter to cast his ballot for the person of his choice for office, whether the name of the person he desires to vote for appears upon the printed ballot or not. Statutes which deny the voter this privilege are in conflict with the constitutional provision guaranteeing the right of suffrage to every citizen possessing the requisite qualifications, and are void. Legislatures may provide for the printing of an official ballot and

prohibit the use of any other, but they cannot restrict the elector in his choice of candidates, nor prohibit him from voting for any other than those whose names appear on the official ballot.''

The same thought is expressed in 10 Am. & Eng. Ency. of Law (2d Ed.) 587, after discussing provisions for nominating candidates under the Australian ballot system:

''Thus they are not unconstitutional, because they provide for legal nominations, and require them to be made in a certain way in order to entitle a candidate to have his name printed on the official ballot, provided the voter is allowed by writing on the ballot to vote for others than those nominated, if he sees fit. But, as the Constitutions guarantee to voters the right to vote for whom they please, a law restricting the right to vote to those candidates whose names appear on the official ballot is to that extent unconstitutional.''

Cooley, in his work on Constitutional Limitations (7th Ed.), page 912, says:

''The system of ballot voting rests upon the idea that every elector is to be entirely at liberty to vote for whom he pleases and with what party he pleases, and that no one is to have the right or be in position to question his independent action, either then or at any subsequent time.''

The question was before the Supreme Court of Florida, in *State v. Dillon*, 32 Fla. 545, 579 (14 So. 383), where that court declared:

'' 'The distinguishing theory of the ballot system is that every voter shall be permitted to vote for whom he pleases and that no one else shall be in a position to know for whom he has voted or shall know, unless the voter shall of his own free will inform him.' There is no doubt in our minds about the right of the legislature to prescribe an official ballot and to prohibit the use of any other; and the provisions of the act in reference to printing the names of candidates regularly nominated by a convention, mass meeting or primary election, or who run as independents, are valid. But the legis-

lature cannot, in our judgment, restrict an elector to voting for some one of the candidates whose names have been printed upon the official ballot. He must be left free to vote for whom he pleases and the Constitution has guaranteed to him this right. If the legislature can restrict the voter to some candidate whose name is printed on the official ballot, then it may prescribe such regulations for getting the names of candidates on the ballot as will completely destroy the liberty of choice.''

Again, in *Sanner v. Patton,* 155 Ill. 553, 563 (40 N. E. 290):

''It is also said that ample provision has been made in the act whereby candidates may be nominated, and thus be entitled to have their names placed on the ticket, and that it is the intention of the act that no vote should be cast for a person who was not nominated. If such was the intention, why did not the legislature say so, and why did it say directly the contrary? What, it may be asked, is there so sacred in the nomination of a candidate for office by a political caucus that a voter should be compelled to vote for a nominee of the caucus or else be deprived of the elective franchise? . . . The legislature does not possess the power to take away from a resident citizen the right of suffrage unless he has been convicted of an infamous crime. Nor can the legislature do indirectly what they cannot do directly; and yet, if the construction contended for by appellee be the correct one, the voter is deprived of the constitutional right of suffrage. He is deprived of the right of exercising his own choice, and when this right is taken away, there is nothing left worthy of the name of the right of suffrage—the boasted free ballot becomes a delusion.''

In *Bowers v. Smith,* 111 Mo. 45, 52, the Supreme Court of Missouri thus expressed itself on the subject:

''By our Constitution, general elections are held at certain fixed dates, and the right of suffrage is expressly secured to every citizen possessing the requisite qualifications. . . . The new ballot law cannot properly be construed to abridge

the right of voters to name their public servants at such elections, or to limit the range of choice (for constitutional offices) to persons nominated in the modes prescribed by it. Nominations under it entitle the nominees to places upon the official ballots, printed at public expense, but the Missouri voter is still at liberty to write on his ballot other names than those which may be printed there.''

See *People v. Shaw,* 133 N. Y. 493, 497 (31 N. E. 512), where the court said:

''But that it was in no wise intended to prevent the voter to vote for any candidate whom he chose is evident from the further provisions of the law that 'the voter may write or paste upon his ballot the name of any person for whom he desires to vote for any office.' Indeed, to hold otherwise would be to disfranchise, or to disqualify, the citizen, as a voter or a candidate, and, in my opinion, to affect the law quite unnecessarily with the taint of unconstitutionality in such respects.''

The only decision directly the contrary is that of *Chamberlain v. Wood,* 15 S. D. 216 (91 Am. St. 674; 56 L. R. A. 187), by two judges; and we have only to say that the dissenting opinion by Justice Fuller seems to us the more persuasive. The majority seem to have followed *Commonwealth v. Reeder,* 171 Pa. St. 505 (33 Atl. 67.) There, a court consisting of seven members was created by the legislature, but each elector was restricted to voting for but six candidates for the seven offices. The act was upheld on the theory that this was in accord with legislative construction of the Constitution and that a subsequent constitutional convention had not changed the fundamental law in this respect. Williams, J., in an able opinion, dissented. It would seem that, if the elector may be limited to voting for but one or more persons for a larger number of offices, he might be denied to vote for candidates other than for a single office. The Supreme Courts of Ohio and New Jersey reached a different conclusion, in *State v. Constantine,* 42 Ohio 437 (51 Am. R. 833) ; and *McArdle v.*

*Mayor and Aldermen of Jersey City*, 66 N. J. Law 590, 591 (88 Am. St. 496). *In re* Opinion of Judges of the Supreme Court of Rhode Island also was to the contrary (41 Atl. 1009). The learned annotator of the note to *Chamberlain v. Wood*, (S. D.) in 91 Am. St. 674, has this to say at page 688:

"The foregoing copious extracts from the decisions in various jurisdictions leave little to be said on the question of the right of electors to vote for a candidate whose name is not printed on the official ballot. On principle, nothing can be clearer than this right, and nothing can be more subversive of a free ballot than its denial. We have not discovered a single authority, save the principal case and perhaps *Commonwealth v. Reeder*, 171 Pa. St. 505 (33 Atl. 67), that intimates the competency of the legislature to deny this right. And, as before pointed out, the court in the latter case misconceived the law. We should admire the courage of the South Dakota court in announcing its conclusion in the face of the decisions of the other states, if it were defensible on principle. But regarding it, as we do, to be destructive of one of the greatest institutions yet realized in the evolution of society, we have no hesitancy in denouncing it as a dangerous precedent."

If the constitutional right to vote at all elections may be whittled away by denying the privilege to the elector of voting for persons to fill all the elective offices, or denying him the right to vote for anyone other than those whose names are on the ballot, then such right is worth no more than the legislature cares to make of it and nothing is acquired under the fundamental law through the provisions relating to the right of suffrage. Those qualified are given the right to vote at all elections, by the section quoted, not for persons the legislature directly or indirectly specifies, but according to their own free and unrestricted choice. Only by the free and untrammelled choice can the electors be said to exercise all that political power which is declared by the Constitution to be inherent in the people. We reach the conclusion that any limitation of

the right of the elector to vote for whomsoever he chooses would be inconsistent with Sec. 1 of Article 2 of the Constitution. The point having been fully argued, its decision is appropriate and persuasive in construing the act under consideration. See *Hunter v. Colfax Consolidated Coal Co.*, decided at the present session (Nov. 24, 1915. Petition for rehearing overruled Apr. 6, 1916.)

If, then, these statutes are open to the construction that the electors are not limited thereby, in voting the non-partisan judicial ticket, to names printed on the ballot, they should be so construed. Nowhere is the elector expressly restricted from the right to vote for whomsoever he pleases. True, he is to use the form of ballot printed as prescribed, but nothing contained in the chapter relates to the manner of marking or depositing the ballot, except that part of Sec. 1087-b4 saying that "the method . . . of preparation of the ballot, of canvassing the vote . . . shall, so far as applicable, be the same as now provided for the regular primary and general election laws of Iowa."

3. ELECTIONS: nonpartisan judicial act: validity: elector's freedom of choice.

The preparation of the form of the ticket is covered by previous sections, so that the words "preparation of the ballot", as here found, may well be construed to have reference to the preparation thereof by the voter before depositing it. The manner of doing this is prescribed by Sec. 1119 of the Code Supplement, 1913:

"Upon retiring to the voting booth, the voter shall prepare his ballot by placing a cross in the square opposite the name of each candidate for whom he desires to vote. The voter may also insert in writing, in the proper place, the name of any person for whom he desires to vote, making a cross opposite thereto. The writing of such name without making a cross opposite thereto, or the making a cross opposite such blank without writing a name therein shall not affect the validity of his vote."

Some reliance seems to be placed on the first section, but

that merely specifies the object of the act, i. e., the nomination and election of candidates, as therein provided.

Sec. 1087-b3 prescribes the manner of printing the tickets and declares that "the candidate or

4. ELECTIONS: nonpartisan judicial act: construction: "candidates on such judicial ticket."

candidates on such judicial ticket receiving the highest number of votes shall be considered elected."

The names necessarily appear on the ticket when cast or counted, and this does not purport to exclude those whose names are written or pasted on the ticket. If placed thereon in either manner, the ticket, when counted, bears the same precisely as effectively as though printed thereon. The manner of conducting the election, including preparation of the ballot by the voter, is not covered by the act at all, save in Sec. 1087-b4, saying that these matters shall be according to the general statutes on these subjects. The manner of nomination of candidates and the duties of officers in preparing the form of ballots are not to be confused with the right of the elector to freely exercise his choice and the method provided for doing so. There is nothing here restricting him to the candidates nominated nor precluding him from voting for any other. The writing or pasting on the ballot the name of the person of his choice does not create of such person a candidate in the sense in which that word is used in the preparation of the form of ballot, though he thereby becomes the candidate of the particular persons voting. The former becomes a candidate by his own volition (Sec. 1087-a10, Code Sup., 1913); the latter, by the action of electors in writing or pasting his name on the ballot and voting for him. The names, regardless of how they get there, are on the ballot when cast, and, of course, as said in Sec. 1087-b3, the candidate or candidates on such judicial ticket receiving the highest number of votes should be considered elected. This construction of these statutes constituting the "non-partisan judiciary" law is at least as reasonable as would be that adopted by the district court, declaring the elector limited to the choice

between those regularly nominated, and whose names are printed on the ballot; and if so, should be preferred, as the latter construction would render the act, or at least a portion of it, unconstitutional. The court recognized this difficulty and evidently was persuaded that the decision of the Supreme Court of South Dakota, *Chamberlain v. Wood*, 56 L. R. A. 187 (91 Am. St. 674), though contrary to the great weight of authority and, as we think, sound reason, should be followed.

We are of opinion that the votes cast for the incumbent were rightly counted and that he was properly declared elected by the board of supervisors, acting as canvassers.

II. Was Cardell a practicing attorney at law at the time of election, as exacted by Sec. 257 of the Code? The evidence shows that he was admitted to the bar in 1882 and was actively engaged in the practice of law from that time until 1906, with residence at Perry, except three or four months. During this time, he served six years as county attorney and was connected as partner with several firms. Upon the election of his last partner to the district bench, in 1906, he discontinued trial work, owing to ill health. But he maintained his office until 1911, when he moved into rooms with another attorney. He appears to have disposed of most of his library in the fall of 1910, with the design of moving to Idaho to engage in practice in that state; but he later changed his mind and remained at Perry, making use of the library of the lawyer occupying rooms with him. Since 1906, he has not engaged in trial work nor been in attendance at court, save occasionally; but he has been consulted by clients at his office, given advice, prepared contracts, wills and other instruments and attended to some probate matters. He appears not to have advertised as an attorney nor to have sought for legal business, as attorneys do, "without soliciting", but did advertise that he had money to loan. The circumstance that he and his wife had some money to loan and that he sometimes loaned that borrowed of others

5. JUDGES: qualification: "practicing attorney."

does not obviate the fact that he never discontinued his practice, but was engaged therein, more or less, up to the time of election. Therein, he was "practicing as an attorney at law" quite as definitely as though he had spent his time in the trial of cases in court. In fact, many of the most learned and successful lawyers are never seen at the trial table. Theirs is what is commonly known as an office practice. As said in *In re Duncan,* 83 S. C. 186, 189 (18 Ann. Cases 657, 658; 24 L. R. A. (N. S.) 750, 753):

"It is too obvious for discussion that the practice of law is not limited to the conduct of cases in courts. According to the generally understood definition of the practice of law in this country, it embraces the preparation of pleadings and other papers incident to actions and special proceedings and the management of such actions and proceedings on behalf of clients before judges and courts, and, in addition, conveyancing, the preparation of legal instruments of all kinds, and, in general, all advice to clients and all actions taken for them in matters connected with the law. An attorney at law is one who engages in any of these branches of the practice of law." See also *Eley v. Miller,* 7 Ind. App. 529 (34 N. E. 836).

One may be a practicing attorney in following any line of employment in the profession. If what he does exacts knowledge of the law and is of a kind usual for attorneys engaging in the active practice of their profession, and he follows some one or more lines of employment such as this, he is a practicing attorney at law, within the meaning of the statute. The extent of his practice is not determinative; for the clientage men draw differs as much as lawyers do. If he holds himself out to the public as an attorney at law and is rendering some services in a professional way—such as comes to him— he is a practicing attorney. It need only be added that the incumbent was eligible, as a practicing attorney at law, to the office. Having reached these conclusions, it is unnecessary to take up the points raised by the incumbent, though the

statutes relating to election contests might well be made more definite in defining the contests to be submitted under Secs. 1201 and 1224 of the Code. The district court should have found that the incumbent was elected.—*Reversed.*

All the Justices concur.