In the Matter of the Application of JOHN J. HOPPER, Appellant, v. J. GABRIEL BRITT et al., Constituting the Board of Elections of the City of New York, Respondents.

Constitutional law — legislation contravening the spirit of the Constitution is void as well as legislation which violates its express commands — Election Law — unconstitutionality of the statute (L. 1911, ch. 649, § 12) providing that the name of a person, nominated by more than one party, shall be printed but once upon the ballot.

1. Not only is legislation contravening the express commands of the Constitution void, but legislation contravening what the Constitution necessarily implies is also void.

2. The power granted to the legislature to prescribe the method of conducting elections cannot be so exercised as to disfranchise constitutionally qualified electors, and any system that unnecessarily prevents the elector from voting or from voting for the candidate of his choice violates the Constitution.

3. The provision of section 12 of chapter 649 of the Laws of 1911, that the name of a person nominated by more than one political party shall be printed but once upon the ballot, and regulating in detail the method of carrying out such provision, is unconstitutional as unjustly discriminating between electors in the facility afforded them for casting their votes for the candidates of their choice.

*Matter of Hopper* v. *Britt*, 146 App. Div. 363, reversed.

(Argued October 3, 1911; decided October 10, 1911.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered September 28, 1911, which reversed, as matter of law, an order of Special Term granting a motion for a peremptory writ of mandamus to compel the board of elections of the city of New York to print sample and official ballots for the ensuing general election in accordance with the provisions of section 331 of the Election Law as they stood prior to the passage of chapter 649 of the Laws of 1911.

The facts, so far as material, are stated in the opinion.

*Herbert R. Limburg* and *Clarence J. Shearn* for appellant. The portions of chapter 946 of the Laws of 1911 which amend sections 331, 368 and 134 of the Election Law are clearly unconstitutional and void. (*Matter of Halpin,* 108 App. Div. 271; *Matter of Callahan,* 200 N. Y. 60; *Matter of McCloskey,* 21 Misc. Rep. 365; *Matter of Bolger,* 48 Misc. Rep. 584; *Matter of Independent Nominations,* 186 N. Y. 278; *Wynehamer* v. *People,* 13 N. Y. 393; *People ex rel. Devery* v. *Coler,* 173 N. Y. 103; *People ex rel. Goring* v. *President, etc.,* 144 N. Y. 616; *Matter of Madden,* 148 N. Y. 136; *Fernbacher* v. *Roosevelt,* 90 Hun, 441.)

*A. S. Gilbert* and *Julius M. Mayer* for appellant. The law under discussion violates the provisions of section 1 of article 1 and of article 2 of the Constitution of the state. (*Wynehamer* v. *People,* 13 N. Y. 393; *Taylor* v. *Porter,* 4 Hill, 140; *White* v. *White,* 5 Barb. 474; *People* v. *Toynbee,* 20 Barb. 198; *Burby* v. *Howland,* 155 N. Y. 270; *People ex rel. Bolton* v. *Albertson,* 55 N. Y. 50; *Matter of Callahan,* 200 N. Y. 60.)

*Albert S. Bard* for Citizens' Union, intervening. The ballot provisions of the statute are unconstitutional because of the arbitrary discrimination between different political organizations with respect to the granting or withholding of a place on the ballot. Among other discriminations "political parties" are given a place on the ballot, but "independent bodies" are denied a place under precisely similar circumstances. (*Matter of Callahan,* 200 N. Y. 59; *Murphy* v. *Curry,* 137 Cal. 479.) The obvious purpose of the act is to put artificial and arbitrary barriers in the way of fusion of parties and independent voting. These are violations of equal rights of suffrage and render the act unconstitutional. The right to nominate is an empty right unless a political organiza-

10

tion may compete with other organizations at the polls upon equal terms. (*Matter of Callahan,* 200 N. Y. 59.)

*Archibald R. Watson, Corporation Counsel* (*Abram I. Elkus, Terence Farley* and *George P. Nicholson* of counsel), for respondents. The act is a reasonable regulation, and is within the legislative discretion. (*Matter of Madden,* 148 N. Y. 136.) The only rights which the Constitution safeguards are the rights of electors. No such rights are violated by the act of 1911. (*Matter of Madden,* 148 N. Y. 136; *Todd* v. *Election Comrs.,* 104 Mich. 474; *State* v. *Bode,* 55 Ohio St. 224.) The Constitution does not guarantee to a party a column on the ballot. (*State ex rel. Runge* v. *Anderson,* 100 Wis. 525.)

*D-Cady Herrick, R. Burnham Moffat, John B. Stanchfield, Bartow S. Weeks, Ellwood M. Rabenold* and *Frank M. Patterson* for Democratic State Committee, intervening.

CULLEN, Ch. J. This appeal presents a single issue, the constitutionality and validity of certain provisions of an act of the legislature of this year (Chap. 649, Laws 1911) entitled "An act to amend the election law generally." In this state for some years in the conduct of elections we have had the official ballot. Under the various statutes prescribing the form and character of that ballot, every political party that cast at the preceding election 10,000 votes for governor is entitled to a column on the ballot in which are placed the names of its nominees for the various offices to be filled by election. In the caption of the column is the name of the party and also any emblem that it may select to designate it. Further provision is made for independent nominations; that is to say, any body of electors may by certificate place in nomination for offices any persons they choose and select a party name and party emblem. Such independ-

ent nominations are given a column or part of a column as may be requisite, together with a caption giving the name and emblem adopted by the body, the same as in the case of nominations by political parties. For such independent nominations, if the nominees are candidates for state offices, six thousand or more voters are required to execute the certificate; if for municipal offices, two thousand in cities of the first class, one thousand in those of the second class, and five hundred in those of the third. Finally, there is a blank column containing no names of candidates, in which the elector may write the name of any person whom he chooses. Prior to the legislation under review a voter might by a cross mark in the circle at the head of any column vote for all of the nominees contained in such column, and if he chose to vote for some other person for any particular office he might make a similar mark opposite the name of that person, if such name was printed on the ballot; or, if not, write the name in the blank column. Physically disabled or illiterate voters, unable to read the ballot, are entitled to assistance in preparing their votes. A narration of further details is unnecessary for the disposition of this case.

It will be seen by this statement that the names of various candidates if placed in nomination by more than one political party or independent body would appear on the ballot in more than one place. By the statute of this year it has been enacted that "If any person shall have been nominated by more than one political party or independent body for the same office, his name shall be printed but once upon the ballot, and shall appear in the party column of the party nominating him which appears first upon said ballot, unless the said candidate shall by a certificate in writing duly signed and acknowledged by him request the custodian of primary records to print his name in the column of some other party or independent body which shall have nominated him, in which event

his name shall be printed in such other column only. * * * When the same person has been nominated for the same office to be filled at the election, by more than one party or independent body, the title of such office shall be printed in the columns where his name is not printed, and underneath such title shall be printed in brevier capital type the words 'See column,' the blank space to contain the name of the party column in which his name is printed, excepting that if any independent body shall have nominated only the candidates of the other party or independent body, no separate column for the independent body in which the candidates' names do not appear shall be printed upon the ballot." (Section 12.) The relator contends that the statute is unconstitutional as unjustly discriminating between electors in the facilities afforded them for casting their respective votes, because where candidates are nominated by two or more organizations they can receive the "straight vote" of the electors of but one organization, while those affiliated with the other organizations which have placed them in nomination are compelled to seek other columns on the ballot referred to only by name, and there make the necessary additional marks, thus tending to confuse the electors and defeat their intention to vote for all the nominees of their organization. The Special Term of the Supreme Court held these provisions of the statute bad and granted a writ of mandamus to the election officers commanding the preparation and issue of the ballots in accordance with the old form. The Appellate Division has, by a divided court, reversed this order and denied the application as a matter of law and not in the exercise of discretion.

In the consideration of the question before us we are not unmindful of the principle that before a court should declare a statute of the legislature invalid it must be clearly shown that the statute is irreconcilable with the Constitution; nor do we fail to appreciate the hesita-

tion with which courts should hold enactments of the legislature void. It may be true, as urged by the learned counsel for the respondents, that at the present day some courts are disposed to invade the constitutional prerogatives of a co-ordinate branch of the government by regarding what they believe to be the spirit of the Constitution, rather than its express mandates. But necessarily in all Constitutions or other instruments there are certain propositions which the instruments import, as well as those they expressly and in terms assert. Therefore, it is well settled that legislation contravening what the Constitution necessarily implies is void equally with the legislation contravening its express commands. A notable instance of this is the right to condemn private property. Our Constitution has never expressly forbidden taking private property for private use, but only prescribes that "Nor shall private property be taken for public use without just compensation." (Article 1, section 6.) Yet the courts early held that this necessarily excluded the right to take such property for private use, with or without compensation (*Matter of Albany Street,* 11 Wend. 149), a doctrine which has been steadily adhered to. (*Taylor* v. *Porter,* 4 Hill, 140; *Matter of Ryers,* 72 N. Y. 1.) The only provision of the Federal Constitution on the subject which affects the power of the states is that contained in the fourteenth amendment, that no state shall deprive any person of property without due process of law. It was said by the Supreme Court of the United States in *Madisonville Traction Company* v. *Saint Bernard Mining Company* (196 U. S. 239, 251): "There ought not to be any dispute, at this day, in reference to the principles which must control in all cases of the condemnation of private property for public purposes. It is fundamental in American jurisprudence that private property cannot be taken by the Government, National or state, except for purposes which are of a public character, although such taking

be accompanied by compensation to the owner. That principle, this court has said, grows out of the essential nature of all free governments."

The qualifications of voters are prescribed by section 1 of article 2 of the Constitution and those qualifications are exclusive. By section 5 of the same article it is provided that "All elections by the citizens, except for such town officers as may by law be directed to be otherwise chosen, shall be by ballot, or by such other method as may be prescribed by law, provided that secrecy in voting be preserved." By section 1 of article 1 it is enacted that no member of this state shall be disfranchised unless by the law of the land or the judgment of his peers. It is, therefore, clear that the otherwise plenary power granted to the legislature to prescribe the method of conducting elections cannot be so exercised as to disfranchise constitutionally qualified electors, and any system of election that unnecessarily prevents the elector from voting or from voting for the candidate of his choice violates the Constitution. We have said "unnecessarily," for there is no practicable system of conducting elections at which some electors by sickness or other misfortune may not be able to vote. Under our law the blanket ballot affords a voter who may be unable to read the ballot from illiteracy or physical defect, an opportunity to vote by securing assistance, and to every elector the right to vote for whom he chooses by writing the name in the blank column if the name of his candidate is not on the ballot. If these rights were not accorded, the present Election Law would be unconstitutional. In *People ex rel. Goring* v. *President, etc., of Wappingers Falls* (144 N. Y. 616) a vacancy occurred in the office of the police justice of the village. At the next election the official ballot did not contain the name of that office or of any candidate to be voted therefor. The relator received votes at the election, the voters writing his name and the office on the ballot. It was contended that under the language of the Election

Law, the votes were invalid. This court held the election good, saying: "The legislature may prescribe regulations for ascertaining the citizens who shall be entitled to exercise the right of suffrage, for that power is given to it by the Constitution. In prescribing regulations for that purpose, or in respect to voting by ballot, it does so subject to and, presumably, in furtherance of the constitutional right and its enactments are to be construed in the broadest spirit of securing to all citizens, possessing the necessary qualifications, the right freely to cast their ballots for offices to be filled by election and the right to have those ballots, when cast in compliance with the law, received and fairly counted. Legislation which fails in such respects and prevents the full exercise of the right as secured by the Constitution is invalid." (p. 229.) Indeed, there has been serious criticism on the constitutionality of the system because so many votes have been declared void by reason of the irregularity in the form of the marks made by the voters.

We think the constitutional provisions recited and the provision that certain officers shall be chosen by the electors necessarily further imply that every elector shall have the right to cast his vote with equal facility to that afforded to other voters, or, to speak more accurately, without unnecessary discrimination against him as to the manner of casting his vote. The learned counsel for the respondents have cited the decisions of the courts of several states upholding election laws with provisions similar to that under discussion. The clearest expression of the ground on which the decisions of those courts proceed is found in the opinion of the Supreme Court of Michigan in *Todd* v. *Election Commrs.* (104 Mich. 474): "The Constitution does not guarantee that each voter shall have the same facilities with every other voter in expressing his will at the ballot-box, or, to apply the rule to the present case, it does not guarantee to each voter the right to express his will by a single mark. * * * It

follows then that every voter has a reasonable opportunity to vote for him (the candidate). This is the sole constitutional right guaranteed him."

Doubtless the Constitution of this State does not guarantee to each voter the right to express his will by a single mark or in any other particular manner, but with great deference to the learned court from which we have quoted, in our opinion the Constitution, by providing that certain officers shall be chosen by the electors, does guarantee that each voter shall have the same facilities as any other voter in expressing his will at the ballot-box, so far as practicable. Any other principle, in our judgment, would be destructive of fair elections. Some impediments to the exercise of the right to vote are, as already stated, under any practicable system of conducting elections unavoidable, and when these impediments are dependent on circumstances and conditions not connected with the status of the candidates, for whom the vote is to be cast, they rarely affect the result of an election — the losses of one candidate being offset by those of the others. Not so with the impediments of the kind prescribed by this statute, which are directed solely at the status of the particular nominee for whom the vote is to be cast. The change from the old system does not diminish the size of the ballot, nor does it decrease the printing on it; it does not tend to make voting easier for the elector, or to avoid confusion on his part, but has the contrary effect. Surely the name of a candidate printed in the appropriate column is less confusing to the elector than a reference to some other column denoted only by its party name. While the Constitution does not guarantee that the elector shall be allowed to express his vote by a single mark, our position is that he is guaranteed the right to express his will by a single mark if other voters are given the right to express theirs by a single mark and there is no difficulty in according the right to all. It is said by the Supreme Court of Ohio in *State* v. *Bode* (55

Ohio St. 224), in upholding a law of this kind: "There is no discrimination against or in favor of any one; and if any inequality arises, it arises not from any inequality caused by the statute, but by reason of inequalities in the persons of the voters, and such inequalities are unavoidable. It is always much more difficult for some electors to cast their ballots than others. Distance, bad roads, means of transportation, bad health, and many other considerations, may and do render it much more difficult for some men to cast their ballots than others. But these difficulties inhere in the men themselves, and not in the law. * * * The inconvenience is only that experienced by every one who votes other than a straight ticket." This argument ignores the distinction between difficulties or inconveniences occurring by nature or accident and inconvenience created by statute. Inequality in the facilities afforded the electors in casting their votes may defeat the will of the people as thoroughly as restrictions which the courts would hold to operate as a disfranchisement of voters. In 1884 the control of the government of the whole country was transferred from one political party to another through the vote of this state by an average plurality of less than 1,150 votes. The vote for the electors of the successful party was over 560,000. Therefore, if an inconvenience in the method of casting his vote applicable to one candidate only had affected the vote of but one man in 470, the result would have been changed. If it were provided that voting on the blanket ballot should be done by either writing or pasting thereon under the names of the offices to be filled, the names of the candidates, it is not certain that this plan could be condemned as creating such obstacles to the exercise of the rights of the electors as to render the scheme unconstitutional; but if the plan went further and provided that the candidates of the party polling the highest vote at the last election should be printed in one column and the electors allowed

to vote therefor by a cross-mark, while all the other candidates were required to be voted for by writing or pasting their names on the ballots, I think no one would hesitate to condemn the scheme as unconstitutional. Certainly under that plan there would be great difficulty in turning out the party in power. The condemnation of such a statute would proceed, at least primarily, not on the ground that it disfranchised the voters, but on account of the unequal opportunities to vote afforded the electors. That we are right in the position that equality of opportunity should be afforded electors is a fundamental principle of the constitutional law of this state, we need only refer to the first Constitution adopted by us. Previous to the Revolution elections in the colony were held *viva voce*. The Constitution of 1777 recited: "Whereas, an opinion has long prevailed among divers of the good people of this State, that voting at elections by ballot would tend more to preserve the liberty and *equal* freedom of the people than voting *viva voce:* to the end, therefore, that a fair experiment be made, which of these two methods of voting is to be preferred:" and it directed that after the termination of the war then existing between the colonies and Great Britain the legislature should enact that elections for senators and representatives should be by ballot, and should direct the manner in which the same should be conducted. We, therefore, hold the statutory provisions challenged to be unconstitutional because they unnecessarily and substantially discriminate between electors in the opportunities and facilities afforded for voting for the candidates of their choice. If the discrimination were trivial our decision would be different, but we know from the election litigations that have come before us that the discrimination here is of a very substantial character, and where voting machines are used the difficulty of voting a split ticket is still greater than where voting is by ballot.

At this point we may call attention to a later decision

made by the Supreme Court of Michigan. In *Dapper v. Smith* (138 Mich. 104) the validity of a provision which required that before the name of any candidate should be placed on the ballot such candidate should on oath declare his purpose to become such, was challenged and held unconstitutional. It was said by the learned court: " The man who may be willing to consent to serve his State or his community in answer to the call of duty when chosen by his fellow-citizens to do so is excluded, and the electorate has no opportunity to cast their votes for him. It is not an answer to this reasoning to say that the electors may still vote for such a man by using ' pasters.' We cannot ignore the fact that parties have become an important and well-recognized factor in government. Certain it is that this law fully recognizes the potency of parties, and provides for party action as a step towards the choice of an officer at the election. The authority of the legislature to enact laws for the purpose of securing purity in elections does not include the right to impose any conditions which will destroy or seriously impede the enjoyment of the elective franchise." As already said, we think it doubtful whether a form of official ballot by which all voting should be done by pasters which are easily attached to the ballot, could be held such an obstacle as to destroy or defeat the enjoyment of the elective franchise. But the decision could very properly have proceeded on the ground that an unnecessary and substantial discrimination against any body of electors was unconstitutional.

It is urged that there are inequalities under the old form of ballot, but, at least, the most of those inequalities are unavoidable. The party that polled at the last election the greatest number of votes is given the first column on the ballot. As long as the face of the ballot is a plane surface, which has always been the case with us, and there is a party column, some party must have the first place. Every candidate is not given the right to

have his name printed on the official ballot. Such a provision would render an official ballot impossible. But not only are all parties or bodies polling 10,000 votes, which is less than one per cent of the whole vote of the state, given the right to a separate column, but independent bodies, on the petition of but a small fraction of the electorate, have the same right. Thus, the rights of the electors of all organizations which have the most remote or shadowy chance of electing their nominees are given equal rights with those of the great parties, while the inviolable right of every elector is secured by the blank column. But if the character of the ballot necessarily involves discrimination against certain classes or bodies of electors, it is a reason that the statute should not increase the discrimination.

It has been urged in justification of the statutory provisions before us that independent bodies are often organized for the sake of trading or combining with the regular parties or other organizations on corrupt considerations. It is not pretended, however, that the statute tends to prevent that evil, save in one way, by making it more difficult to vote fusion or coalition tickets. The same argument was advanced in *Matter of Callahan* (200 N. Y. 59), where it was held that the legislature could not constitutionally prevent the nomination of fusion or combination candidates. We there said: "The liberty of the electors in the exercise of the right vested in them by the Constitution to choose public officers on whatever principle or dictated by whatever motive they see fit, unless those motives contravene common morality and are, therefore, criminal, such as bribery, violence, intimidation or fraud, cannot be denied." (p. 62.) The legislature might make combinations effected by bribery or illegal considerations criminal and punish the actors. On proof that an organization was effected and nominations made in pursuance of such criminal bargain the courts might be authorized to strike such nominations from the ballot.

But because many coalitions between various bodies of electors are corrupt and criminal it cannot forbid coalition nominations or indirectly effect the same thing by rendering it more difficult to vote for a coalition nominee. One great object of the present ballot was to prevent bribery by rendering it difficult to determine how any elector voted. There is, however, an opportunity for identification left. The elector may, in the blank column, write the name of some particular candidate and thus identify his vote. Undoubtedly the voter may be punished for so doing on proof of the unlawful purpose for which he wrote the name of the particular person. Fortunately the evil does not seem at all common. But even if it were prevalent, to correct the evil the inviolable right of the elector to vote for whom he chose could not be invaded.

The method of voting on an official ballot which has prevailed with us now for a number of years probably has corrected evils that formerly were prevalent. But, personally, I fear that, in some respects, it has undermined public morality on the question of the right of the elector to vote for whom he will, provided it is dictated by no criminal consideration. Ever since the adoption of the present scheme there has been an attempt to provide a ballot in such form as to prevent the elector from voting in the way he wishes to vote. In this constant effort it must be conceded that persons desirous of so-called ballot reform, and not political partisans, have been the most active, though by the present legislation the latter seem to have been more successful. All labors by a citizen to induce his fellow-citizens to change the principle on which they cast their votes, when he believes that principle is injurious to the welfare of the community, are praiseworthy and patriotic. But however gross may be the error of his fellows he has no moral right to correct that error by making it difficult for them to exercise their constitutional rights.

The order of the Appellate Division should be reversed and that of the Special Term in substance affirmed, without costs. There are some errors, however, in the form of the Special Term order, for which reason it must be modified, and the order may be settled on two days' notice before the judge writing the opinion.

HAIGHT, VANN, WERNER, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur.

Ordered accordingly. ·