MARTÍNEZ NADAL ET AL., PETITIONERS, *v.* SALDAÑA, EXECUTIVE
SECRETARY OF PORTO RICO, RESPONDENT.

No. 224.—Decided August 22, 1924.

MANDAMUS—PURPOSE OF REMEDY—PUBLIC OFFICERS—ELECTIONS—RESTRICTION OF
SUFFRAGE.—The Organic Act having conferred the right to vote upon the
qualified electors of the Island, the Legislature can regulate but not amend
the constitutional right of such electors, and the requirement of the signatures
of ten per cent of them in order to nominate candidates by petition as pre-
scribed by Act No. 2 of 1924 (p. 37) is unreasonable, deprives the electorate
of its right to vote and is unconstitutional and void.

ID.—ID.—PUBLIC RELIEF—ALLEGATIONS OF PETITION.—When the relief sought is
of a public character a writ of mandamus may be petitioned for without
alleging demand upon and refusal to comply of the official against whom it
is directed.

ID.—ID.—ID.—ID.—It being alleged in a petition for mandamus that a certain
law is contrary to the Organic Act and restricts the right of suffrage, and
the latter containing several provisions conferring that right, no greater
specification is necessary as regards the particular provisions alleged to have
been violated.

MANDAMUS—JURISDICTION—SPECIAL CASES.—The courts will entertain mandamus
proceedings brought for the purpose of deciding questions before demand
and refusal to do some act only in very exceptional and extraordinary cases
when the refusal to entertain the proceedings might and probably would
result in rendering the decision of the court useless.

PETITION for a writ of mandamus presented to Mr. Justice Adolph
G. Wolf, sitting alone during the vacation of the Court, to
compel the registration of the nominations of the political parties
in accordance with Act No. 79 of June 25, 1919, and not with
Act No. 2 of June 18, 1924, and that the latter Act be declared
void.

An alternative writ was issued on August 22, 1924, and the
27th of the same month was set for hearing the parties and for
the respondent to show cause why a peremptory writ should not
be issued.

At the hearing held on August 27th the secretary of the court
informed the judge that he had just received from the respond-
ent's attorney an answer to the alternative writ and that the
said attorney stated, in accordance with the answer, that the
case should be heard by the full court, requesting the judge so
to order. The judge being of the opinion, after considering the
answer, that he had no power to proceed with the case, ruled
that the case be submitted to the Court at its next term.

The facts are stated in the opinion.

*Mr. Cayetano Coll y Cuchí* for the petitioners.

*The Attorney General* and *Messrs. Miguel A. Muñoz, C. Llauger Díaz* and *J. A. Fernández* for the respondent.

Opinion delivered by MR. JUSTICE WOLF.

The fundamental object of this petition, as amended, is to obtain for the "Partido Constitucional Histórico" the right to nominate candidates by petition. Petitioners maintain that Act No. 2 of the Extraordinary Session of the Legislature of 1924 entitled "An Act to Amend Section 37 of the Election and Registration Law . . . ." is unconstitutional and void. The prayer of the petition is that the Executive Secretary of Porto Rico be ordered to disregard said act and to make records of the political parties in accordance with Act No. 74 of July 30, 1923. The two substantial questions presented by this petition, momentarily putting aside all matters of form or procedure, are:

Whether there is anything in the fundamental law of Porto Rico which would prevent the Legislature from limiting the right of suffrage in Porto Rico; and

Whether the Act of 1924 is an unreasonable invasion of the rights of the electorate and therefore unconstitutional.

## 1.

Before discussing any of the fundamental or subsidiary questions involved in this petition, it seems convenient first to mention the matter of jurisdiction. The tradition of this court was that while an individual justice might issue a writ of mandamus to be returned to the court, said justice by himself had no right to determine the questions involved in a petition for mandamus or to make a peremptory order. The argument of petitioners on the presentation of the petition and the re-reading of the law made me doubt a little. On the whole I am inclined to revert to my original idea of this writ, although in the issuance of the order which accompanies this opinion I shall leave the question an open one. In other words, I shall make the writ returnable to "the court," which

may be interpreted to mean, as the case may be, either the individual judge or the whole court.

The principal argument of the petitioners in this regard was that if a judge had a right to issue the writ, he also had a right to determine it. However, without stopping to verify the matter now from the books, I am quite certain that various writs may be issued, out of an appellate court by individual justices and made returnable to the whole court. In my own experience or reading I know that individual justices of the Supreme Court of the United States have so issued writs of error, preceedings in bankruptcy and, if I am not mistaken, writs of habeas corpus. In many cases, necessarily, and in vacation time, such powers can readily be placed in individual judges and it is a convenient mode of avoiding the taking the whole time of the court. The doubt that I have in favor of petitioners is the literal wording of the Law of Mandamus, the fact that this court is in vacation, and that the law requires, for some purpose not fully disclosed, that one of the judges of the Supreme Court of Porto Rico shall always be at the capital.

The reasons why I am inclined to agree with the Attorney General that an individual judge may not make a definite determination are, first, that section 1 of the Law of Mandamus makes a writ issue out of the Supreme or district courts of Porto Rico. An individual judge is not the Supreme Court and at the time the Mandamus Act was passed in 1903 the district judge was not the district court. In 1903 the district courts were composed of three judges. Throughout the Act it is generally the "court" that is spoken of, and while the words "the court" might mean an individual judge if he had power to command defendant, yet when in the Act the word "court" is so used, I think it must be considered in opposition to an individual judge who has the right to issue the writ in the first place.

It would be a corollary to this proposition that an individ-

ual judge would have no right to punish for contempt. He would have it if he is to be considered as the court.

The failure of the Act to provide any recourse to the whole court in the case of an individual judge of the Supreme Court ordering a peremptory mandamus. In the Habeas Corpus Law provision is made for an appeal from the action of an individual judge. None is made in the Mandamus Law. Appeals in Porto Rico are either directly fixed by law from the district courts or expressly given as in the Habeas Corpus Act. In no sense is a judge of the Supreme Court, upon issuing the writ, an officer of an inferior court from which an appeal might be taken to the Supreme Court. It could hardly have been the intention of the Legislature to give individual judges such complete power without providing an appeal.

If I had been completely satisfied of the unconstitutionality of the Act of 1924, I should have issued an alternative writ in the first place and made it returnable to the court, but as the first part of the alternative writ is mandatory in form and in this way is something like a temporary expression of opinion by the judge that issues it, I did not care to issue the writ in said alternative form without first hearing from the parties as to the constitutionality of the said act. The parties appeared before me on the 15th day of August, 1924, and discussed the various questions involved.

## 2.

Sections 26, 27, 28, 29, 35 and 36 of the Organic Act, so far as pertinent, provide as follows:

"Sec. 26.—That the Senate of Porto Rico shall consist of nineteen members elected for terms of four years by the qualified electors of Porto Rico. Each of the seven senatorial districts defined as hereinafter provided shall have the right to elect two Senators, and in addition thereto there shall be elected five Senators at Large. . . .

"Sec. 27.—That the House of Representatives of Porto Rico shall consist of thirty-nine members elected quadrennially by the qualified electors of Porto Rico, as hereinafter provided. Each of the

representative districts hereinafter provided for shall have the right to elect one Representative, and in addition thereto there shall be elected four Representatives at Large. . . . .

"Sec. 28.—That for the purpose of elections hereafter to the Legislature the Island of Porto Rico shall be divided into thirty-five representative districts, composed of contiguous and compact territory and established, so far as practicable, upon the basis of equal population. The division into and the demarcation of such districts shall be made by the Executive Council of Porto Rico. . . .

"Sec. 29.—That the next election in Porto Rico shall be held in the year nineteen hundred and seventeen upon the sixteenth day of July. At such election there shall be chosen Senators, Representatives, a Resident Commissioner to the United States and two Public Service Commissioners, as herein provided. Thereafter the elections shall be held on the first Tuesday after the first Monday in November, beginning with the year nineteen hundred and twenty, and every four years thereafter, and the terms of office of all municipal officials who have heretofore been elected and whose terms would otherwise expire at the beginning of the year nineteen hundred and nineteen are hereby extended until the officials who may be elected to fill such offices in nineteen hundred and twenty shall have been duly qualified. . . . . "

"Sec. 35.—That at the first election held pursuant to this Act the qualified electors shall be those having the qualifications of voters under the present law. Thereafter voters shall be citizens of the United States twenty-one years of age or over and have such additional qualifications as may be prescribed by the Legislature of Porto Rico: Provided, That no property qualification shall ever be imposed upon or required of any voter.

"Sec. 36.—That the qualified electors of Porto Rico shall at the next general election choose a Resident Commissioner to the United States, whose term of office shall begin on the date of the issuance of his certificate of election and shall continue until the fourth of March, nineteen hundred and twenty-one. At each subsequent election, beginning with the year nineteen hundred and twenty, the qualified electors of Porto Rico shall choose a Resident Commissioner to the United States, whose term of office shall be four years from the fourth of March following such general election, and who shall be entitled to receive official recognition as such Commissioner by all of the departments of the Government of the United States, upon presentation, through the Department of State, of a certificate of election of the Governor of Porto Rico. . . . . "

At the hearing of this case there was some discussion as to whether the right to vote was a natural or inherent right of the citizens of the United States, and some mention was made of the decisions in the Women's Suffrage case, where it was held that this was not an inherent right. Here, however, we are considering an alleged constitutional provision. In some States there are no provisions in the constitutions about the right of suffrage. The matter of election is very largely in the hands of the Legislature. In Porto Rico, however, the right to vote for Resident Commissioner, for Senators and Representatives is given to the qualified electors of Porto Rico by the Organic Act. In my opinion, therefore, an Act which would seriously interfere with the right of the qualified electors of Porto Rico to cast their vote would be unconstitutional.

Where a constitution is silent on the matter the legislature of a State has absolute control of elections and may award or restrict the suffrage as it chooses. In other words, as has been said, the legislature then is the supreme expression of the will of the people to award or limit the vote more or less as it sees fit, limited principally by the U. S. Constitution. There may be exceptions, but they do not affect the question in this case. Of course, then it might be argued that the Legislature could pass an electoral law which would govern the election of officers other than those named in the Organic Act. In that case if Act No. 2 was unconstitutional with respect to the particular officers named, it probably would not be susceptible of division to save its constitutionality, given the whole tenor of the election laws.

However, I think that it may be deduced from the Organic Act, and particularly the sections that I have cited, that it was the intention of Congress to give the qualified electors of Porto Rico the right to vote at all elections and for all offices. The reading of the Organic Act leads me to this view and this idea is enhanced by the terminating words of section 35, which were that no property qualifications

shall ever be imposed upon or required of any voter. While the Legislature is authorized to put a limit on qualified voters, otherwise the intention of Congress is disclosed that qualified voters should have the right to vote at elections.

The design of Congress was to make the people sovereign through their qualified electors. This Court, through the writer, drew attention to this purpose in *Torres* v. *Municipal Assembly of Guánica,* opinion of June 19, 1924, *ante,* page 337. We said: ''Porto Rico has been accorded, like every State in the Union, a representative form of government. Fundamentally, the people rule and elect their representatives. The representatives are elected by the qualified voters.'' That a legislature may regulate but not annul the constitutional right of qualified voters has been decided many times and I shall not stop to quote the decisions.

### 3

The very principal question in this case is whether Act No. 2 of 1924 does interfere with the right of the qualified electors of Porto Rico to vote at the elections.

It is conceded that there were about 250,000 voters in Porto Rico at the last election. The part of the Act of March 2, 1924, to which most objection is made, is as follows:

''A petition for the nomination of a candidate for any office to be voted for in a precinct, municipality, district, or in the whole Island, must be signed by petitioners equal in number to ten per cent of the total vote cast for all candidates for Commissioner to the United States in such precinct, municipality, district, or the Island, at the preceding election, respectively, and there must be at least two hundred petitioners in the case of each and every nomination.''

So that, in order to obtain the right to vote as a party for a resident commissioner, the petitioning political party must obtain 25,000 signers and proportionately with respect to senators, representatives and other officials. This seems an exorbitant number. The petitioners expressed them-

selves satisfied with the previous law by which 200 signers in twenty different municipalities must be obtained, or, in other words, at least 4,000 signatures. This was already, in may opinion, a considerable number. While I agree that innumerable small parties should not be formed, I am likewise inclined to think that 4,000 signatures in Porto Rico is a considerable number, although if the Legislature, in a regular primary law, had fixed a somewhat higher number a court perhaps would have nothing to say. It was insisted at the hearing, and this has been followed up in the brief of the respondent, that to require ten per cent of the voters of Porto Rico was not unreasonable. The respondent points out that there are a number of municipalities in Porto Rico —21 in all—where a 10 per cent requirement would be less than 200 votes and that in others it would vary from 200 upwards; that a thousand petitioners would be required only in the larger cities of the island and for senators in no place as much as 4,000. The theory of the Executive Secretary was apparently that it ought not to be a hardship to require 10 per cent of the total vote in order to form a new party. To me it seems otherwise, given the inception and origin of many political parties. I doubt if some of the parties, forerunners of the Republican Party in the United States, could ever have mustered in the various States ten per cent of the total vote, and it is true today of other parties whose candidates have appeared on official ballots in such States.

In practically all of the United States and in Porto Rico the ballots are secret. A new party or any party cannot muster its whole strength in a petition or at the primaries. It was somewhat questioned in one case whether to require 30 per cent of the party's strength to be cast at a primary was not an unreasonable provision. The enactment was sustained by the court as being a primary and not an election law. *State* v. *Anderson*, 118 N. W. 22. In other words it was recognized that it would be very difficult to make a party

at a primary muster as much as 30 per cent of its total strength. The point is that a new party that can obtain 25,000 votes probably, in a normal case, has 50,000 or more electors. It may be conceded that by active measures the leaders of a party may arouse a greater number to sign a petition than would normally go to the primary polls. Nevertheless, a great many people would not care to sign a petition for a new party although they might secretly vote for it. Men would hate to confess perhaps at the first election that they had parted from their former affiliations. Some men fear their party chiefs and some may fear their associates or their employers. It may safely be surmised that a party that finally mustered 50,000 at the polls would find difficulty in getting 25,000 signatures. The requirement that an old party, to have a place on the ballot, must have cast 20 per cent of the total vote at the previous election refers to a past accomplishment. The old party then is not required to do anything for the coming election. When, however, a distinctly new party is formed which might have a right to expect to draw from all of the older parties at the polls to require 10 per cent for its formation, is generally to deny it life and to put it to a harder test than is required of any existing party. In effect, I am of the opinion that to require 10 per cent signers for the formation of a new party in Porto Rico is entirely unreasonable.

In *People of the State of New York ex Rel. Hotchkiss* v. *Smith et al.,* constituting a Board of Elections of Putnam County, etc., 206 N. Y. 321, the Court of Appeals of the State of New York decided that a provision of a law requiring more than 500 signatures for nominations in assembly districts or other political divisions of the State greater than a town or ward of a city, was unconstitutional. It was a question of number. The respondent distinguishes this case, inasmuch as the number of total votes required was excessive for some districts or municipalities, but maintains that the 10 per cent vote cannot work such hardships. The

respondent maintains that a percentage vote is entirely just; attempts to show that high percentage rates similar to the one before us have been sustained in various courts of the United States. To this effect primary laws are cited. *McGrael et al.* v. *Phelps et al.*, 35 L.R.A. (N.S.), 353; *State* v. *Anderson*, 118 N. W. 22, 29, *supra*.

A primary law in itself is no guide at all. It is not the election law. The great drift of authority is that in order to prevent fraud and to produce the party's strength the Legislature may require that ten, twenty or thirty per cent of the voters of a party appear on the primary election day. One of the reasons for the high number is to be certain that the candidates are a true expression of the party and that the primary selection is not the partial result brought about by the voters of an opposite party. There is an able discussion in *Ledgewood* v. *Pitts,* 125 S. W. 1036. The courts have said that the Legislature within reasonable limits may control the primary laws and hence the number of persons who may be required to vote at such primaries. However, I fail to see the analogy between these primary election laws and the number of votes required to form a new party. A primary election law is admittedly or generally for the expression of parties already formed and some of these primary laws also make provision by which new parties may have a place on a printed ticket. There are, of course, provisions, as here, that in order to entitle a party to a regular place on the ballot the said party must have cast ten, fifteen or twenty per cent, as the case may be, of the total votes in the last election for some particular office. It cannot be pointed out too strongly that to require a certain percentage of a previously organized party to be present at the polls is never anything more than an expression of party strength and therefore always a possibility. The party leaders with these percentages of their whole members, in case of emergency, can find the persons to go to the polls.

In *State* v. *Blaisdell* (N. D.), 127 N. W. 720, the court said:

"Much misapprehension and misconception of the primary election law is prevalent. The writer has heard it remarked many times that voters ought to have the privilege of voting for members of any party or for members of no party at the primary and that a vote cast for democrats by republicans ought to count toward the nomination of candidates for the democratic party. All such ideas are beside the mark. The law (primary) is not intended to and does not provide for non-partizan nominations. Its sole purpose is to provide for and regulate the nomination of candidates by political parties. Those who belong to no party or to parties not casting the percentage of votes necessary to bring them within the terms of the primary election law, as parties may proceed in another manner as provided by statute and their rights to become candidates or to make nominations within their respective parties or political circles are not infringed."

It is evident that in North Dakota, as in other places, the primary law is for the regulation of parties that come up to a certain number in the previous elections and does not relate to parties that are just coming into existence. The Attorney General cites North Dakota as one of the places where a 10 per cent requirement for new candidates is promoted. As I take it, the statute of that State applied the ten per cent in favor of communities whose total could not come up to 300, but limited the number in any case to 300 signatures. The Attorney General also cited a case from Nevada of *State* v. *Harmon,* 127 Pac. 221. The total population in Nevada in 1920 was 77,407. The male voting strength was hence about 15,000 votes. The total vote in the State by petition, therefore, at ten per cent, would only have required 1,500 signatures. The probability is that a ten per cent requirement in Nevada was necessary to secure a fair number of signatures in each county in the State. No constitutional question was involved in the *Harmon Case,* nor in *State* v. *Brodigan,* 126 Pac. 680, also from Nevada.

*Stewart* v. *Cartwright,* 118 S. E. 861, was a case where

an individual candidate for mayor in the city of Savannah, Georgia, was required to obtain one-third of the registered voters. He seemed to have obtained them and it was his opponent who sought for a mandamus. The validity of the one-third requirement was not involved. It was not state-wide, but limited apparently to the particular city. The main point is that the requirement did not affect the life of a party at all, but only a person who sought to be nominated independently of a party. For a man to appear on a ballot independently of any party, a one-third vote was required. The court sustained the right to independent voting.

Petitioners also cited a primary law from California, which was declared unconstitutional, but outside of California primary laws have generally been upheld just as, in the absence of a constitutional provision, election laws have been upheld.

From the foregoing, if I am right in holding that a 10 per cent requirement is unreasonable, then it would follow that such a provision deprives a considerable portion of the electorate of their right to vote and hence is unconstitutional and void.

4

In going over the Election Law for Porto Rico, it is evident from sections 36, 41, 42 and 63 that the scheme or the nominal scheme of elections in Porto Rico is a party one. In the whole law there is no provision made for voting for anybody who is not already a candidate of a political party. In nearly all the States and under nearly all the Australian ballot laws that exist in the States, provision is made for casting independent votes, or for candidates who are not named on the printed or official ballot. It is strongly intimated in numerous decisions that the Australian ballot law in the respective States would be null and void unless it made such provision, or unless the voter had a right to vote

for·him he chooses by placing a sticker on the final ballot or by scratching some name and putting in some other.

Speaking of the right of every individual to vote as he chooses, it is said in 9 R. C. L. 1054, that the failure to afford this right was a serious interference with the freedom of the exercise of franchise; that while the Legislature might limit the number of names printed upon the official ballot, the voter must be left free to vote for candidates of his own choice. In *Cole* v. *Tucker,* 164 Mass. 488, the court remarked that the so-called Australian ballot acts in the various forms that they have been enacted in many of the States have been sustained, provided the acts permit the voter to vote for such persons as he pleases. *Stewart* v. *Cartwright,* 118 S. E. 861, mentioned by the Attorney General, shows the wide extension of the same provision. See also 91 A. S. R. 682; 20 Corpus Juris, 140 *et seq.* See also especially *In re City Clerk of Patterson,* 88 Atl. 694, 695.

The Porto Rican law seems to make it impossible, or at least impracticable, for any voter to make an independent choice in the election. In other words, in Porto Rico the rule is that a voter must cast his ballot for candidates already named and submitted to the Board of Elections by the Executive Secretary. I shall not at this time attempt to discuss the effect of such an omission· in Porto Rico. I am taking it for granted that the Legislature had a right to enact a party system for Porto Rico. Assuming this power in the Legislature of Porto Rico and finding that the only way in which all the qualified electors of Porto Rico may cast their vote as provided by the various sections of the Organic Act is by voting for one of the heretofore recognized or organized political parties or else by obtaining a right by petition, it would seem that any act which would make it hard for a considerable number of electors to cast their vote would be unconstitutional. Emphasis must be laid upon the fact that in Porto Rico, by the Organic Act, every qualified elector has a right to vote. He cannot be compelled to vote

for a party with which he does not affiliate. The Election Law should be a liberal expression to meet the intention of Congress that every qualified elector may vote, and any law which unduly restricts this right is unconstitutional and void, as I maintain is Act No. 2 of the Special Session of 1924, or at least in part.

### 5.

In answer to the rule to show cause the Executive Secretary, through the Attorney General, objected that the petition for a mandamus did not show any demand upon the said Executive Secretary and that there was nothing in the petition to show that the Executive Secretary would fail to comply with the object of the petition. Whereupon the petitioners obtained leave to amend their petition to state that they were informed and believed that the Secretary of Porto Rico would follow the law as passed by the Legislature, and this is the presumption. It might almost be con verted into a presumption of law that the Executive Secretary, in the absence of a decision of the court or some very strong advice by the Attorney General, would follow or attempt to follow the law as laid down by the Legislature. The case of *People ex rel. Hotchkiss* v. *Smith,* 206 New York, 321, *supra,* would seem to indicate that in a case like this such indication of a failure to comply by the respondent is unnecessary, and something of that sort seems to be implied in said opinion. The Attorney General, however, draws attention to the fact that when the *Hotchkiss Case* was presented in the lower courts there were indications that the election of officials would follow the existing law subsequently declared unconstitutional. I am strongly of the opinion that the petitioners in a case like the present, where a legislature had just made and passed a law, have a right to presume that the secretary will follow it. Not only is this true, but the Attorney General is here in behalf of the Executive Secretary, contending for the constitution-

ality of this law. I take it that we are all desirous of having the question settled and the only effect of insisting on this point, if I am wrong, would be that petitioners would have to present another petition after they had finally filed their election papers.

As to a previous demand, in a matter of great public concern like the present the decisions indicate that such a demand is unnecessary. The cases cited by the Attorney General to the contrary were not really matters of public concern, not even the case of *Negrón* v. *The Superintendent of Elections,* 11 P.R.R., 352.

In the following authorities it has been decided that there is a distinction between duties of a public nature and duties of a private nature affecting only the rights of individuals. In such cases the law itself stands in lieu of demand and omission to perform the required duty is equivalent to a refusal. *Torres* v. *The Municipal Assembly of Guánica,* decided June 13, 1924, *ante,* page 337; *State ex rel. Morris* v. *Wrightson,* 22 L. R. A. 548, 561; *People ex rel. O'Brien* v. *Cruger,* 12 App. Div. 536; *Matter of Hopper,* 73 Misc. Rep. 369, 376.

In the *Torres Case* we intimated that the issuance of a writ to show cause, or the alternative writ, was notice enough.

### 6.

It is also asserted that the petition is informal in not setting forth the particular precepts of the Constitution that are supposed to have been violated. The petitioners did set up that Act No. 2 was in violation of the Organic Act, and where there are so many sections of it giving the qualified elector a right to vote for various officials, a greater specification seems unnecessary. Sections 35 and 36 were mentioned at the hearing before me. The Executive Secretary will have notice by this opinion of the sections relied upon, and if the matter is of any importance the petitioners will be granted leave to amend.

7.

Another form of objection was that nothing has been presented to the Executive Secretary which requires his action. I am content to answer this as did the Court of Appeal of New York in *Hotchkiss* v. *Smith,* 206 N. Y. 231, *supra:*

"In this case a refusal to entertain the proceeding might and probably would result in the failure of the action of the court being of any practical avail. It appears that the organization represented by the petitioners has not been in existence a sufficient length of time to enable it to have a standing as a party organization within the terms of the statute. The organization intends to make independent nominations and one of the defendants has stated that the election board will comply with the terms of the amendments to the Election Law made in 1911. If this proceeding is not entertained it may result in preventing such independent nominations. The situation is exceptional and extraordinary. The proceeding should be entertained, although it is not intended as a precedent in cases between individuals as such or in any case except where the facts and circumstances are equally exceptional and extraordinary. (See the action of this court in *Matter of Hopper* v. *Britt,* 203 N. Y. 144; *Matter of Hopper* v. *Britt,* 204 N. Y. 524, and also of the court in *State ex rel. Morris* v. *Wrightson,* 56 N. J. L. 126.) "

The Executive Secretary also drew attention to the fact that the petitioners had proceeded under the new law with regard to the city of Moca. An attempt to comply, however, does not estop petitioners. They may not obtain the desired signatures elsewhere. It is a question of a right in the petitioners to proceed independently of the Act of 1924.

As almost invariably happens in election cases, the time which a judge has for analysis and development is short. As it is, the opinion shows signs of the pressure under which it was prepared and I am reasonably certain, however, that when an election law which refuses, in a place populated as is Porto Rico, to give recognition to a new party unless it can produce by petition ten per cent of the electorate at the preceding election, denies the right of suffrage to a consid-

·erable number of the qualified voters and is unconstitu-
tional and void. Whether other parts of the Act are also
void, I leave for further discussion.

Even if I were convinced that I had the power to issue
a peremptory writ, it would seem, after my holding that the
Act was at least in part unconstitutional, that the Executive·
Secretary should be given the opportunity to comply with
this viewpoint. Not being convinced of my power to issue
a peremptory writ, an alternative writ will be issued requir-
ing the Executive Secretary to ignore so much of the Act
of June 18, 1924, as requires the certification of ten per cent
of the voters at the previous election and proceed in accord-
ance with previous acts.