[L.A. No. 32013. Dec. 30, 1985.]

JACK CANAAN et al., Petitioners, v.
CHARLES ABDELNOUR, as City Clerk, etc., et al., Respondents.

COUNSEL

Michael Schaefer for Petitioners.

Gregory Marshall as Amicus Curiae on behalf of Petitioners.

John W. Witt, City Attorney, Ronald L. Johnson, Senior Chief Deputy City Attorney, Eugene P. Gordon, Chief Deputy City Attorney, and Kenneth So, Deputy City Attorney, Lloyd M. Harmon, Jr., County Counsel, Howard P. Brody, Chief Deputy County Counsel, and Susan J. Boyle, Deputy County Counsel, for Respondents.

OPINION

**BIRD, C. J.**—Does the City of San Diego's prohibition on write-in voting in municipal elections violate the state or federal Constitutions?

I.

The California Elections Code provides procedures for write-in voting in all federal, state and local elections. (Elec. Code, §§ 7300-7313, 17100-17102.)[1] However, the California Constitution authorizes charter cities to adopt municipal election regulations irrespective of general laws on the same subject. (Cal. Const., art. XI, § 5, subd. (b)(3).) Pursuant to this constitutional authorization, the charter City of San Diego has enacted regulations governing the conduct of municipal elections. At the time this action was brought, section 27.2205 of the San Diego Municipal Code prohibited write-in voting in all primary and general municipal elections.[2] On June 17, 1985, after oral argument in this case, the San Diego City Council amended section 27.2205 to allow write-in candidates and write-in voting in municipal primary and special primary elections. Write-ins are still pro-

---

[1]Section 17102 provides: "Every voter shall be entitled to write the name of any candidate for any public office, including that of President and Vice President, on the ballot of any election." (Cf. § 22843.5 [no write-ins where election cancelled because there is no contest for any municipal office and no city measure to be submitted to the voters]; § 25304 [incumbent judge's name removed from the ballot when no write-in opposition filed 59 days before the general election], see *post,* pp. 726-727.)

[2]The superseded section 27.2205 provided: "No write-in candidates shall be permitted. A ballot containing the name of any person not printed on the official ballot shall be counted as if the name added did not appear."

hibited in general municipal, special general and recall elections.[3] This court may take judicial notice of the amendment of the ordinance. (Evid. Code, § 452, subd. (b).)

Under San Diego's new scheme, a candidate may qualify for placement on the primary ballot by filing a nominating petition not later than 60 days before the primary election.[4] Write-in candidates may file nominating papers after the filing deadline, up to 14 days before the primary election. (San Diego Mun. Code, § 27.3209.) A candidate who receives a majority in the primary is elected. (San Diego Charter, § 10.) If no candidate receives a majority, the two candidates receiving the highest number of votes are placed on the ballot for the general elections. (*Ibid.;* San Diego Mun. Code, § 27.3210.) The only candidates for whom the electorate may cast valid ballots in the general election are those whose names appear on the ballot.

This case arose out of the San Diego mayoral election of 1984. Nine candidates qualified for the primary ballot, including the incumbent mayor.

After the filing deadline for the primary election had passed, but before the primary, a civil suit was filed by the San Diego District Attorney against the mayor, alleging certain irregularities in campaign contributions. In response to this development, petitioner William Brotherton sought to become a write-in candidate for mayor at the June primary. Petitioner Jack Canaan sought the opportunity to cast a write-in vote for Brotherton.

Petitioners filed an original petition for writ of mandate in this court in May of 1984. Named as respondents were the City of San Diego; Charles G. Abdelnour, the city clerk in charge of administering municipal elections; Raymond Ortiz, the San Diego County Registrar of Voters; and all the mayoral and city attorney candidates who had qualified for placement on the primary ballot. Petitioners sought to compel respondent Abdelnour to

---

[3]Section 27.2205 now provides in pertinent part: "Write-in candidates are permitted in the municipal primary elections and special primary elections. General municipal, special general or recall election ballots containing the name of any person not printed on the official ballot shall be counted as if the name added did not appear. . . ." Division 32, entitled "WRITE-IN CANDIDATES," was also added. Its sections provide for the filing of "nominating papers" for write-in candidates 14 days before the primary election and for residency requirements, filing fees, and other procedures comparable to those provided elsewhere in the code for candidates seeking placement on the ballot. (See San Diego Mun. Code, §§ 27.3201-27.3211.)

[4]For municipal elections held in odd-numbered years, San Diego allows nominating petitions to be filed no later than 60 days before the primary. (San Diego Mun. Code, § 27.2111.) In even-numbered years, San Diego coordinates its filing deadline with the filing deadline for the state primary. (*Ibid.*) As a result, a nominating petition must be filed not later than 88 days before the primary. (See Elec. Code, § 6490.)

accept petitions for write-in candidates and to give effect to any write-in votes to be cast in the election. They also requested a stay of the mailing of sample ballots which contained a statement that write-in voting was prohibited. Petitioners argued that the prohibition on write-in voting was unconstitutional. They sought a resolution of the question in time for the June primary. (See Code Civ. Proc., § 44; *Thompson* v. *Mellon* (1973) 9 Cal.3d 96, 98 [107 Cal.Rptr. 20, 507 P.2d 628, 65 A.L.R.3d 1029].) This court transferred the case to the Court of Appeal, which did not render a decision in time for the primary election.

The incumbent mayor was one of the two candidates who qualified in the primary election for placement on the ballot in the general election. After the primary election, the mayor was indicted for numerous alleged felonies. Petitioner Brotherton continued to seek the opportunity to become a write-in mayoral candidate, this time in the general election. Petitioner Canaan continued to seek the opportunity to cast his vote for a write-in candidate.

The Court of Appeal rendered its decision in September of 1984, upholding San Diego's ban on write-in voting. Petitioners then sought hearing in this court. Given the imminency of the general election, resolution of the issue in time to affect that election was not possible.

■ As a preliminary matter, it is clear that although the election is over the matter is not moot. "On numerous occasions in recent years, [this court] ha[s] decided such recurrent election issues although the particular election initially in question had long been completed." (*Gould* v. *Grubb* (1975) 14 Cal.3d 661, 666, fn. 5 [122 Cal.Rptr. 377, 536 P.2d 1337].)[5] ■ However, it is unnecessary to consider the repealed prohibition on write-in voting in primary elections. (See *ante,* fn. 2.) "[T]he version of the ordinance in force at present is the relevant legislation for purposes of this appeal." (*Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 306, fn. 6 [138 Cal.Rptr. 53, 562 P.2d 1302]; see also 9 Witkin, Cal. Procedure (3d ed. 1985), § 254, p. 260.) Nor is the constitutionality of San Diego's new write-in scheme in primary elections at issue, since the validity of the new ordinance has not been briefed or argued by either party. This opinion will address only the constitutionality of San Diego's current prohibition on write-in voting at the *general* election. (See *ante,* fn. 3.)

## II.

Petitioners argue that San Diego's ban on write-in candidates and write-in voting violates the equal protection clauses of the state and federal Con-

---

[5]The matter *is* moot with regard to the specific mayoral and city attorney candidates listed as respondents, and they are therefore dismissed from the action. In addition, petitioners' request for a stay of the sample ballot mailing by the county registrar is moot. Consequently, Raymond Ortiz, the registrar of voters, is also dismissed as a respondent.

stitutions. ■ Respondents argue that the ban is permissible because the regulation of municipal elections in charter cities is a strictly municipal affair. (See Cal. Const., art. XI, § 5, subd. (b)(3); *Socialist Party* v. *Uhl* (1909) 155 Cal. 776, 788 [103 P. 181].)

Although the city's power to regulate municipal elections is broad, that fact is not relevant to a constitutional challenge. This court addressed a similar argument in *Gould* v. *Grubb, supra,* 14 Cal.3d at pages 668-669. "The city emphasizes that the state and charter cities have traditionally exercised broad authority in regulating the mechanics of election procedures . . . . [¶] . . . [L]egislative bodies retain considerable discretion in formulating election procedures and devising regulations for the form and content of ballots. [Citation.] As in all other areas of governmental action, however, the exercise of such discretion remains subject to constitutional limitations."[6]

Although San Diego may regulate the conduct of its municipal elections, it may not do so in a manner which violates the guarantees of the state or federal Constitutions. It is, therefore, necessary to examine the constitutionality of San Diego's prohibition on write-in candidates and write-in voting.

■ Petitioners challenge the ban on equal protection grounds. They contend that strict judicial scrutiny is required because the ban infringes on the fundamental rights to vote and to run for public office. (See *Gould* v. *Grubb, supra,* 14 Cal.3d at p. 670.) Respondents argue that they must demonstrate only that the prohibition bears a rational relationship to a legitimate governmental interest. They assert that petitioners have defined no "suspect class" affected by the prohibition and that no fundamental right is implicated. Initially, it is necessary to consider whether an equal protection analysis or a more direct First Amendment analysis provides the proper constitutional framework in this case.

In analyzing constitutional challenges to election laws, this court has followed closely the analysis of the United States Supreme Court. (See, e.g., *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 798-805 [187 Cal.Rptr. 398, 654 P.2d 168]; *Gould* v. *Grubb, supra,* 14 Cal.3d at pp. 669-675; *Castro* v. *State of California* (1970) 2 Cal.3d 223, 228-242 [85 Cal.Rptr. 20, 466 P.2d 244].)

---

[6]See also *Williams* v. *Rhodes* (1968) 393 U.S. 23, 29 [21 L.Ed.2d 24] "[T]he Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution."

The high court has generally addressed the validity of election regulations under the equal protection clause. However, the basis for the court's selection of that approach and the precise nature of the equal protection tests employed has not always been easily discernable. And, as is true for equal protection doctrine in general, the standard of review utilized in voting and election cases has been in a state of flux. (See *Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 466-468 [125 Cal.Rptr. 129, 541 P.2d 881]; citing Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection* (1972) 86 Harv.L.Rev. 1, 10-15.)

For example, in *Storer* v. *Brown* (1974) 415 U.S. 724 [39 L.Ed.2d 714, 94 S.Ct. 1274], the Supreme Court upheld a California Elections Code provision which denied placement on the ballot to independent party candidates who had been affiliated with a qualified party within one year prior to the primary election. In *American Party of Texas* v. *White* (1974) 415 U.S. 767 [39 L.Ed.2d 744, 94 S.Ct. 1296], the court upheld a state election scheme which, inter alia, required independent candidates to demonstrate a certain minimum level of support before qualifying for placement on the ballot. In both these cases the Supreme Court upheld ballot access restrictions, finding that the restrictions served compelling state interests. However, the court did not explore the extent to which the restrictions were *necessary* to achieve the states' purposes, nor did it consider whether less offensive alternatives were available. As one commentator has noted, "[t]he most baffling aspect of *American Party* and *Storer* was the standard of review being applied. . . . [It] seems to have been a mix of strict and minimal scrutiny." (Tribe, American Constitutional Law (1978) p. 783.)

More recently, in *Clements* v. *Fashing* (1982) 457 U.S. 957 [73 L.Ed.2d 508, 102 S.Ct. 2836], the high court upheld, by a five-to-four vote, a Texas statute which required certain public officials who wished to run for the state legislature to complete their current term of public office in order to qualify as candidates. The court also upheld a provision which deemed a public officeholder's announcement of candidacy for another office to constitute an automatic resignation from the current office. The plurality opinion utilized an extremely deferential rational basis test. But as the dissent pointed out, "a majority of the Court . . . reject[ed] the plurality's mode of equal protection analysis." (*Id.,* at p. 977, fn. 1 [73 L.Ed.2d at p. 524] (dis. opn. of Brennan, J.).)

The seeming inconsistency in the choice and application of standards in this area has led some commentators to advocate an analysis which focuses more directly on the extent to which election regulations infringe on First and Fourteenth Amendment rights. (See, e.g., Note, *Better Late Than Nev-*

*er: The John Anderson Cases and the Constitutionality of Filing Deadlines* (1983) 11 Hofstra L.Rev. 691, 700, 703-704 [hereafter *Constitutionality of Filing Deadlines*]; see generally Note, *State Restrictions on Municipal Elections: An Equal Protection Analysis* (1980) 93 Harv.L.Rev. 1491, 1507.)

Recently, the United States Supreme Court utilized a First Amendment balancing analysis in evaluating a constitutional challenge to an election law. In *Anderson* v. *Celebrezze* (1983) 460 U.S. 780 [75 L.Ed.2d 547, 103 S.Ct. 1564], the court struck down Ohio's early presidential candidate filing deadline, finding the state's interest in the early deadline to be insufficient to justify its adverse effects on independent political candidates, parties, and voters. The First Amendment analysis used in *Anderson* is responsive to the concerns of the commentators cited above. Further, it provides an approach to evaluating the constitutionality of election laws which is often more appropriate than the traditional two-tiered equal protection doctrine.

The *Anderson* court explained its analysis as follows: "Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions. [Citation.] Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. [Citations.] ▮ ▮ ▮ ▮ The results of this evaluation will not be automatic; as we have recognized, there is 'no substitute for the hard judgments that must be made.' [Citation.]"[7] (*Anderson, supra,* 460 U.S. at pp. 789-790 [75 L.Ed.2d at p. 558].)

---

[7]In utilizing an approach based directly on the First Amendment, the court noted that a separate equal protection analysis would not be precluded. (*Anderson, supra,* 460 U.S. at pp. 786-787, fn. 7 [75 L.Ed.2d at p. 556].) The *Anderson* court continued to rely heavily on cases which utilized the "fundamental rights" strand of equal protection analysis. These cases have focused on the rights of candidates and voters under the First and Fourteenth Amendments. (*Ibid.;* see also *Stoddard* v. *Quinn* (D.Me. 1984) 593 F.Supp. 300, 303, fn. 5.)

A traditional equal protection approach will continue to be more appropriate than a First Amendment analysis in certain cases. For example, whenever election restrictions classify on the basis of suspect criteria, the regulations will be more readily amenable to strict equal protection scrutiny. It is important to note that a balancing test which examines and evaluates

■ In California, the constitutionality of election regulations has also been approached most often as a question of equal protection. Strict scrutiny has been applied when the classification at issue had "a [] 'real and appreciable impact' on the equality, fairness and integrity of the electoral process." (*Gould* v. *Grubb, supra,* 14 Cal.3d at p. 670; accord *Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438].) The determination as to when an election scheme imposes such a burden involves a weighing of many of the same factors which are examined under the balancing test utilized by the Supreme Court in *Anderson.* Here, too, an approach which concentrates directly on the infringement of First and Fourteenth Amendment rights focuses the inquiry on the real issues.

In some cases, California courts have relied directly on the First Amendment to strike down election-related restrictions. (See, e.g., *Schuster* v. *Municipal Court* (1980) 109 Cal.App.3d 887, 892-895 [167 Cal.Rptr. 447] [prohibition on anonymous political campaign literature]; *Loza* v. *Panish* (1980) 102 Cal.App.3d 821, 824-826 [162 Cal.Rptr. 596] [prohibition on references to other candidates in candidates' statements in voter's pamphlet]; *Pacific Gas & Electric Co.* v. *City of Berkeley* (1976) 60 Cal.App.3d 123, 126-129 [131 Cal.Rptr. 350] [city ordinance prohibiting campaign contributions by organizations].)

The issues posed by San Diego's ban on write-in voting are equally amenable to a First Amendment analysis. The essence of petitioners' argument is that a ban on write-in voting infringes directly on fundamental voting rights. The right to vote for the candidate of one's choice and the rights of association and political expression of both voters and potential candidates are affected. Rights relating to the franchise implicate the First Amendment, "with its guarantee that an individual be allowed to participate in the most general communicative processes that determine the contours of our social and political thought." (Tribe, American Constitutional Law, *supra,* p. 737.)

It is preferable, then, to examine San Diego's ban on write-in voting according to the analysis used in *Anderson.*[8]

---

the burdens on First and Fourteenth Amendment rights, and the state's justifications for imposing those burdens, is not necessarily any less rigorous than strict scrutiny equal protection analysis. It will always require a more rigorous analysis than would be undertaken using the deferential rational basis equal protection test.

[8]Several federal courts have concluded that *Anderson* established the appropriate "analytical framework" for evaluation of election regulations. (*Smith* v. *Bd. of Election Com'rs for City of Chicago* (N.D.Ill. 1984) 587 F.Supp. 1136, 1140, fn. 5, 1146; see also *Blomquist* v. *Thomson* (10th Cir. 1984) 739 F.2d 525, 527; *Dart* v. *Brown* (5th Cir. 1983) 717 F.2d 1491, 1503-1504; *Unity Party* v. *Wallace* (2d Cir. 1983) 707 F.2d 59, 61; *Stoddard* v. *Quinn, supra,* 593 F.Supp. at p. 303; *Libertarian Party of South Dakota* v. *Kundert* (D.S.D. 1984) 579 F.Supp 735, 738, fn. 2.)

Petitioners assert that San Diego's prohibition on write-in voting affects two important rights. One is the right of candidates to pursue public office. The other, and more fundamental right, is that of the voters to cast their ballots for the candidates of their choice. Both rights are of constitutional dimension. Both are curtailed by a ban on write-in voting.

There has been some suggestion in the case law that the right to be a candidate for public office may not be fundamental in and of itself. (*Johnson v. Hamilton, supra,* 15 Cal.3d at p. 466; *Fridley v. Eu* (1982) 131 Cal.App.3d 100, 104 [182 Cal.Rptr. 232] [both relying on *American Party of Texas v. White, supra,* 415 U.S. at p. 780, fn. 11 [39 L.Ed.2d at p. 760] and *Bullock v. Carter* (1972) 405 U.S. 134, 142-144 [31 L.Ed.2d 92, 99-100, 92 S.Ct. 849].) However, this court has described the right to hold public office as "valuable, fundamental and one that is subject to First Amendment protection . . . ." (*Johnson v. Hamilton, supra,* 15 Cal.3d at p. 468; accord *Zeilenga v. Nelson* (1971) 4 Cal.3d 716, 723 [94 Cal.Rptr. 602, 484 P.2d 578].)

It has also been recognized that " 'the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.' " (*Anderson, supra,* 460 U.S. at p. 786 [75 L.Ed.2d at p. 556], quoting *Bullock v. Carter, supra,* 405 U.S. at p. 143 [31 L.Ed.2d at p. 99].) It is this "close interlocking conceptual and functional relationship" between the right to vote and the right to hold public office (*Johnson v. Hamilton, supra,* 15 Cal.3d at p. 470) which has given rise to the necessity for careful judicial scrutiny of election regulations which have a " ' " " 'real and appreciable impact' upon the equality, fairness and integrity of the electoral process." [Citations.]' " (*Fullerton Joint Union High School Dist. v. State Bd. of Education, supra,* 32 Cal.3d at p. 799.) "[I]t is difficult to conceive of principles more central to a political democracy than the free and untrammelled access of the public to the ballot box and the reciprocal right of candidates to seek the public's suffrage. It follows, accordingly, that we examine with a close and questioning attention every intrusion, subtle or direct, which impairs or affects the unconditional exercise of these prerogatives." (*Johnson v. Hamilton, supra,* 15 Cal.3d at pp. 468-469.)

There is no question that the right to vote is "fundamental." (*Gould v. Grubb, supra,* 14 Cal.3d at p. 670; *Fullerton Joint Union High School Dist. v. State Bd. of Education, supra,* 32 Cal.3d at p. 799; *Castro v. State of California, supra,* 2 Cal.3d at p. 234; *Libertarian Party v. Eu* (1978) 83 Cal.App.3d 470, 472 [147 Cal.Rptr. 888].) " 'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even

the most basic, are illusory if the right to vote is undermined.'" (*Castro* v. *State of California, supra,* 2 Cal.3d at p. 234.)

■ San Diego's ban on write-in voting affects these two separate but related rights—the right of candidates to "seek the public's suffrage" and the right of San Diego voters to cast ballots for the candidates of their choice. ■ ■ ■ ■ Both these rights are of sufficient magnitude to warrant the protection of the First and Fourteenth Amendments and the comparable provisions of our state Constitution (see Cal. Const., art. I, § 2).[9] ■ It is necessary, then, to examine the "character and magnitude of the asserted injury" to those fundamental rights imposed by San Diego's ban on write-in voting. (*Anderson, supra,* 460 U.S. at p. 789 [75 L.Ed.2d at p. 558].)

Respondents argue that the ban on write-in candidacy does not appreciably affect a candidate's right to seek public office because there are reasonable, nondiscriminatory, alternative methods to qualify for the ballot. However, this case is distinguishable from the cases on which respondents rely. Those cases address restrictions on the right to be listed as a candidate on the printed ballot. The governmental interests which have been held to justify such restrictions are not applicable to write-in candidacy.

Ballot access restrictions have been sustained where they are "generally applicable and evenhanded" (see *Anderson, supra,* 460 U.S. at p. 788, fn. 9 [75 L.Ed.2d at p. 557] and cases cited therein) or where other means of access to the ballot are readily available (see *Storer* v. *Brown, supra,* 415 U.S. at p. 733 [39 L.Ed.2d at p. 725]).[10] However, the courts which have upheld such restrictions have uniformly noted that candidates are not totally precluded from soliciting votes, because they always have the option of conducting a write-in campaign. (See, e.g., *Storer* v. *Brown, supra,* 415 U.S. at p. 736, fn. 7 [39 L.Ed.2d at p. 727]; *Jenness* v. *Fortson* (1971) 403 U.S. 431, 434 [29 L.Ed.2d 554, 558, 91 S.Ct. 1970]; *Unity Party* v. *Wallace* (2nd Cir. 1983) 707 F.2d 59, 62; *Fridley* v. *Eu, supra,* 131 Cal.App.3d

---

[9]Indeed, "[a] protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press." (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]; accord *Loza* v. *Panish, supra,* 102 Cal.App.3d at p. 824.)

[10]Courts have invalidated ballot access restrictions which imposed property ownership requirements (*Choudhry* v. *Free, supra,* 17 Cal.3d at p. 669), prohibitory filing fees (*Bullock* v. *Carter, supra,* 405 U.S. at pp. 144-149 [31 L.Ed.2d at pp. 100-103]; *Knoll* v. *Davidson* (1974) 12 Cal.3d 335, 349 [116 Cal.Rptr. 97, 525 P.2d 1273]), unreasonably long residency requirements (*Johnson* v. *Hamilton, supra,* 15 Cal.3d at p. 472; *Thompson* v. *Mellon, supra,* 9 Cal.3d at pp. 105-106; *Zeilenga* v. *Nelson, supra,* 4 Cal.3d at p. 723), unreasonably early filing deadlines (*Anderson, supra,* 460 U.S. at p. 806 [75 L.Ed.2d at pp. 568-569]), and unreasonably stringent requirements of a showing of public support (*Williams* v. *Rhodes, supra,* 393 U.S. at p. 34 [21 L.Ed.2d at p. 33]).

at p. 104; *Kellam* v. *Eu* (1978) 83 Cal.App.3d 463, 469 [147 Cal.Rptr. 884].)

In the cases which have upheld the constitutionality of restrictions on ballot access, the courts have repeatedly emphasized that the state has an interest in limiting the size and complexity of the ballot. For this reason, before a candidate can have his or her name *printed* on the ballot, the government may require the candidate to make a preliminary showing of substantial support. (*Anderson, supra,* 460 U.S. at pp. 788-789, fn. 9 [75 L.Ed.2d at p. 557]; *Kellam* v. *Eu, supra,* 83 Cal.App.3d at pp. 468-469.) Other requirements, such as a reasonably early filing deadline, are necessary for the orderly layout and printing of the ballot. However, petitioner Brotherton did not seek to have his name printed on the general election ballot. He sought only to be allowed the opportunity to solicit write-ins on election day.[11]

San Diego's ban on write-in voting does more serious injury to the right to vote. ▉ As Justice Douglas noted in a concurring opinion in *Williams* v. *Rhodes,* "I would think that a State has precious little leeway in making it difficult or impossible for citizens to vote for whomsoever they please . . . ." (393 U.S. at p. 39 [21 L.Ed.2d at p. 36], (conc. opn. of Douglas, J.).)

Similarly, this court has announced that "[a] fundamental goal of a democratic society is to attain the free and pure expression of the voters' choice of candidates. To that end, our state and federal Constitutions mandate that the government must, if possible, avoid any feature that might adulterate or, indeed, frustrate, that free and pure choice . . . ." (*Gould* v. *Grubb, supra,* 14 Cal.3d at p. 677; see also *Cohn* v. *Isensee* (1920) 45 Cal.App. 531, 539 [188 P. 279], disapproved in part in *Binns* v. *Hite* (1964) 61 Cal.2d 107, 112 [37 Cal.Rptr. 323, 389 P.2d 947].)

▉ The ban on write-in voting affects the right to vote in two ways. First, it may very well prevent the candidate preferred by the majority of voters from winning election. This is especially likely in situations such as

---

[11]It has been recognized that a write-in candidate is already severely disadvantaged relative to candidates who are listed on the ballot. "To force a candidate to rely on write-ins is to burden him with disability. It makes it more difficult for him to get elected, and for the voters to elect him." (*Williams* v. *Rhodes, supra,* 393 U.S. at p. 37 [21 L.Ed.2d at p. 35] (conc. opn. of Douglas, J.); see Comment, *The Constitutionality of Qualifying Fees for Political Candidates* (1971) 120 U.Pa.L.Rev. 109, 130 [hereafter *Qualifying Fees*]; *Smith* v. *Bd. of Election Comr's for City of Chicago, supra,* 587 F.Supp. at p. 1147, fn. 15.) The right that petitioners are seeking, while of considerable value—especially to the voters (see *post,* pp. 716-718)—is substantially less advantageous to a candidate than is placement on the ballot.

this case, where significant political changes occurred in the interim between the primary and the general election. (See *Anderson, supra,* 460 U.S. at pp. 790-791, fn. 11 [75 L.Ed.2d at pp. 558-559].)

Second, it prevents individual voters from casting ballots for their preferred candidates, whether or not those candidates have any chance of winning election. "A write-in ballot permits a voter to effectively exercise his *individual* constitutionally protected franchise. The use of write-in ballots does not and should not [] depend[] on the candidate's chance of success." (*Socialist Labor Party* v. *Rhodes* (S.D.Ohio 1968) 290 F.Supp. 983, 987, affd. in part, mod. in part *sub. nom., Williams* v. *Rhodes, supra,* 393 U.S. 23, italics added.)[12]

There will always be voters whose views, interests or priorities are not in any way represented by the candidates appearing on the ballot. While candidates who do represent these voters' views may have little chance of success, it is important in a free society that political diversity be given expression.

San Diego's prohibition on write-in voting at the general election prevents voters from exercising "the free and pure expression of [their] choice of candidates" (*Gould* v. *Grubb, supra,* 14 Cal.3d at p. 677), thereby "effectively silencing a form of political dissent essential to our democratic process." (*Constitutionality of Filing Deadlines, supra,* 11 Hofstra L.Rev. at p. 722). "To restrict a voter to only those candidates whose names appear on the ballot arguably denies him any affirmative method of expressing his dissatisfaction with the listed candidates. He faces one choice: he must either select from a group of candidates, all of whom he deems unworthy, or not vote at all." (Batey, *Electoral Graffiti: The Right to Write-in* (1981) 5 Nova L.J. 201, 203.)

Respondents, evidently mindful of the importance to an individual of the right to vote for the candidate of his or her choice, respond that a voter "is not forced to vote for someone listed on the ballot. If he writes-in [*sic*] a candidate, the ballot will be counted as if the name did not appear. He is not denied the opportunity to express his feelings."

A right to "express [one's] feelings" without legal effect, however, is antithetical to the fundamental nature of the right to vote. The First Amendment guarantees the right to *public* political expression. If the expression is

---

[12]See also *Qualifying Fees, supra,* at page 120 ["the right to vote in many ways is an individual right fortifying the dignity of a citizen and bolstering his sense of political participation"].

so effectively muffled that no one can hear it, this guarantee is a hollow one. As this court has said in a slightly different context, " '[t]here is more to the right to vote than the right to mark a piece of paper and drop it in a box or [the] right to pull a lever in a voting booth. . . . It also includes the right to have the vote counted at full value without dilution or discount.' " (*Gould* v. *Grubb, supra,* 14 Cal.3d at p. 671, fn. 10 [striking down an election regulation which placed the names of incumbents first on the ballot], quoting *South* v. *Peters* (1950) 339 U.S. 276, 279 [94 L.Ed. 834, 838, 70 S.Ct. 641] (dis. opn. of Douglas, J.).)

As the Georgia Supreme Court has noted, "[a] refusal to count [an elector's] vote completely ignores it and is tantamount to a refusal to allow him to cast it." (*Thompson* v. *Willson* (1967) 223 Ga. 370 [155 S.E.2d 401, 404] [striking down a state statute which prohibited write-in voting].)

The injuries to petitioner Brotherton's right to stand as a candidate for public office and, more significantly, to petitioner Canaan's right to cast his vote for the candidate of his choice are substantial. Against those injuries, this court must balance the interests advanced by respondents as justifications for the prohibition on write-in voting. (See *Anderson, supra,* 460 U.S. at p. 789 [75 L.Ed.2d at p. 558].)

Respondents assert that the ban is necessary to prevent a candidate from "thrust[ing] him/herself into the voting fray at any opportune or inopportune moment to do violence and damage to the City's chosen system." Specifically, they claim that the ordinance is necessary to assure that (1) candidates meet charter qualifications, (2) candidates have displayed a willingness to serve, (3) the public will have adequate time to investigate and evaluate the candidate's abilities, experience, credentials, and capacity for the office, and (4) the candidate elected will receive a majority of the votes. Respondents also claim that write-in voting would disrupt the scheme for election of the city council.

Preliminarily, it should be observed that the city's broad contention that a candidate may thrust him- or herself into the fray at an inappropriate time can be recharacterized. An individual may initially be satisfied with one or more of the candidates who have qualified for placement on the ballot. As the election season progresses, however, " 'unforeseen occurrences . . . can fundamentally affect all political expectations.' " (*Anderson, supra,* 460 U.S. at p. 790, fn. 11 [75 L.Ed.2d at p. 559], quoting Bickel, Reform and Continuity (1971) p. 88.)

If the candidate who has represented an individual's interests and views is forced to withdraw from the campaign, alters his or her positions or is

indicted for alleged felonies, that individual may feel compelled to become a candidate in order to fill the void. Rather than "doing violence" to the election process, the availability of a write-in candidacy provides the flexibility to deal with unforeseen political developments and may help ensure that the voters are given meaningful options on election day.

Turning to the specific justifications advanced in support of the prohibition on write-in voting and assuming for purposes of discussion that they constitute compelling state interests, it is clear that none warrants the drastic method selected to achieve its ends. Quite simply, a total ban on write-in voting is a grossly overbroad means to achieve the stated goals. In order to warrant burdening the fundamental rights of candidacy and voting, respondents must demonstrate that there are no less drastic alternatives to a prohibition on write-in voting. (See *Fed. Election Com'n* v. *Nat. Conserv. Pol. Action* (1985) 470 U.S. 480, — [84 L.Ed.2d 455, 472-473, 105 S.Ct. 1459, 1471].)[13]

Respondents assert that a ban on write-in voting helps to assure that candidates meet charter qualifications and display a willingness to serve.[14] These may be legitimate goals. However, a complete prohibition on a write-in candidacy at the general election is far too "'crude and imprecise'" (*Johnson* v. *Hamilton, supra,* 15 Cal.3d at p. 469) a device to meet those objectives.

"Whatever spurious and frivolous candidates the [] scheme has weeded out, it has also put an end to a serious, legitimate candidacy." (*McCarthy* v. *Noel* (D.R.I. 1976) 420 F.Supp. 799, 803.) Allowing write-in voting does not mean that a candidate who cannot meet other charter qualifications will be allowed to take office. But such a candidate should be disqualified because he or she does not meet these other requirements. To attempt to eliminate unqualified candidates by banning write-in voting is grossly overinclusive. It is certainly not the least drastic means to achieve that purpose.[15]

---

[13]It is clear that the *Anderson* balancing test requires consideration of whether less drastic alternatives are available to achieve the governmental interests at stake. (*Anderson, supra,* 460 U.S. at p. 789 [75 L.Ed.2d at p. 558]; *Smith* v. *Bd. of Election Com'rs for City of Chicago, supra,* 587 F.Supp. at pp. 1146, 1150; *Libertarian Party of South Dakota* v. *Kundert, supra,* 579 F.Supp. at pp. 739-740.)

[14]Charter qualifications include a 30-day residency requirement and status as a registered voter. (San Diego Mun. Code, § 27.2023.)

[15]Section 27.3205 of the San Diego Municipal Code requires a prospective write-in candidate in the primary election to file a "declaration and affidavit" of candidacy which contains information relating to the candidate's qualifications for office. In addition, section 22.3204 provides that a write-in candidate must meet the usual residency requirements for the office sought.

Similarly, it seems unlikely that a candidate who is unwilling to serve will receive the requisite number of votes to win the election. A ban on write-in voting may prevent ballots from being cast for unwilling candidates, but it will also prevent voters from casting ballots for serious, legitimate candidates who are not listed on the ballot.

Respondents argue that the ban on write-in voting assures that the public will have adequate time to investigate a candidate's qualifications. This argument has some merit. "The potential exists that a late entry write-in candidate will circumvent the intended high exposure months before the primary" (*Fridley* v. *Eu, supra,* 131 Cal.App.3d at p. 105) and presumably before the general election. But once again a total ban on write-in candidates is an overinclusive method to address this concern. (See *Johnson* v. *Hamilton, supra,* 15 Cal.3d at p. 469.)

Unquestionably, the city has an "important and legitimate interest in voter education." (*Anderson, supra,* 460 U.S. at p. 796 [75 L.Ed.2d at p. 562].) However, limiting the voters' choice of candidates to those who have entered the contest over five months before the general election is not necessary to further that interest. " 'Given modern communications, and given the clear indication that campaign spending and voter education occur largely during the month before an election' " (*id.,* at p. 797 [75 L.Ed.2d at p. 563], quoting *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 358 [31 L.Ed.2d 274, 293]), it is unnecessary to impose a cutoff date some five months before the general election.

Further, it is unlikely that an unknown candidate will win the election. As the United States Supreme Court has said, "as a matter of practical politics, the electoral process contains its own cure for voters' ignorance about a particular candidate. Unknown candidates simply do not win large numbers of votes." (*Anderson, supra,* 460 U.S. at pp. 798-799, fn. 25 [75 L.Ed.2d at p. 564].)

More importantly, the electorate may pay a heavy price for the early restriction on the selection of candidates. When the alternatives are established five months before the election, both voters and candidates are limited in their possible responses to changing political conditions. Since the voters are forbidden to cast their ballots for anyone not on the ballot, the voters' right to associate and to participate fully in a discussion of the issues in the last months before the election may be limited. (See *Anderson, supra,* 460 U.S. at pp. 787-788 and fn. 8 [75 L.Ed.2d at pp. 556-557].)

Rather than contributing to voter education, the prohibition on write-in voting may serve to stifle the open and vigorous debate which often leads

to a better understanding of the issues. " 'Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." [Citation.] . . . This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." ' " (*Fed. Election Com'n* v. *Nat. Conserv. Pol. Action, supra,* 470 U.S. at p. — [84 L.Ed.2d at p. 467, 105 S.Ct. at p. 1467], quoting *Buckley* v. *Valeo* (1976) 424 U.S. 1, 14 [46 L.Ed.2d 659, 685, 96 S.Ct. 612]; see also *Schuster* v. *Municipal Court* (1980) 109 Cal.App.3d 887, 892 [167 Cal.Rptr. 447] ["The First Amendment exists to protect free discussion of governmental affairs [citation], for 'speech concerning public affairs is more than self-expression; it is the essence of self-government.' "] (italics omitted).) In sum, San Diego's "claim that it is enhancing the ability of its citizenry to make wise decisions by [effectively] restricting the flow of information to them must be viewed with some skepticism." (*Anderson, supra,* 460 U.S. at p. 798 [75 L.Ed.2d at p. 564].)

Write-in voting is allowed in California in all federal and state elections and in local elections in noncharter cities. (Elec. Code, §§ 7300-7313, 17100-17102.) It seems unlikely that the Legislature would provide expressly for such procedures if the danger of frivolous candidacies and an uneducated electorate were a significant problem. There is no reason to believe these concerns pose any greater danger in San Diego municipal elections than they do in other elections throughout the state.

Respondents assert an interest in insuring that a successful candidate wins a majority of the vote in the general election. The United States Supreme Court addressed a similar argument in *Williams* v. *Rhodes, supra,* "Ohio [argues] that if three or more parties are on the ballot, it is possible that no one party would obtain 50% of the vote, and the runner-up might have been preferred to the plurality winner by a majority of the voters. Concededly, the State does have an interest in attempting to see that the election winner be the choice of a majority of its voters." (393 U.S. at p. 32 [21 L.Ed.2d at p. 32].) The court held, however, that considering the restrictions imposed by the Ohio scheme on voting and associational rights, this state interest provided insufficient justification for those restrictions. (*Ibid.*)[16]

---

[16]Ohio required a new party to obtain a prohibitive number of signatures on a nominating petition in order to obtain a position on the ballot, and further required that the signatures be from persons who had not previously voted for candidates of other parties. (See *Williams* v. *Rhodes, supra,* 393 U.S. at p. 25, fn. 1 [21 L.Ed.2d at p. 28].)

Of course, respondents' asserted justification was irrelevant to the city's former prohibition of write-in voting at the primary election. The primary ballot typically lists numerous candidates. There is no guarantee that the top two vote-getters who advance to the general election will be the choice of a majority of the voters. If a candidate receives a majority in the primary, he or she is elected, and no general election is necessary. (San Diego Charter, § 10.)

Respondents' interest is also insufficient to justify the restriction imposed on the fundamental right to vote in the general election. It is commonplace for election victories to go to plurality winners at the federal, state and local levels. The extent to which a vote for a minority candidate may affect the distribution of votes between major candidates is a consideration which a voter should and will take into account.

It is not the province of the city to deprive the electors of the right to vote for the candidate of their choice in a paternalistic effort to assure that one candidate receives a majority. It is also artificial to fashion a voting majority by forcing voters to cast their ballots for one of two candidates neither of whom they may deem to be worthy. The risk that a candidate who is not preferred by a majority of the voters will be elected is manifestly outweighed by the need to protect the fundamental right to vote. Indeed, it is possible that the *ban* on write-in voting in this case may have *prevented* the election of a candidate who enjoyed the support of the majority of San Diego's voters.

 Respondents also argue that striking down the prohibition on write-in voting would wreak havoc with their scheme for city council elections.[17] Under that scheme, a primary is held in each of eight districts. The two candidates who receive the most votes from each district then run city-wide in the general election. Eight council members are thus elected, one from each district, but they are elected by voters from throughout the city. Allowing write-in votes or candidates in the city-wide election, respondents argue, would permit a candidate to be elected who had no support in the district he or she was primarily to represent. As a hypothetical example, respondents suggest that a white racist candidate might win election in the city-wide voting to represent a primarily black district in which that candidate was extremely unpopular.

---

[17]Respondents first raised this point at oral argument before this court. Although "appellate courts will not ordinarily consider matters raised for the first time on appeal[,] . . . whether the rule shall be applied is largely a question of the appellate court's discretion." (*Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 5 [97 Cal.Rptr. 431], italics omitted.) Since the point is but one aspect of the larger constitutional question, the matter will be addressed in this opinion.

The worst case scenario described by respondents would, of course, be attributable primarily to the at-large nature of the city's councilmanic election scheme itself, not to the availability of write-in voting. That scheme already allows the city's voters to veto the first choice of district voters as to who shall represent them on the city council. Respondents are correct, however, that the availability of write-in voting might exacerbate the most objectionable aspect of the current scheme.

However, allowing write-in voting would also provide flexibility and a safety valve to deal with unforeseen political developments which occur in the five months between the primary and the general election. The availability of a write-in candidate might also prevent the election of a candidate who ran a distant second in the district primary, when the favored candidate has been forced to withdraw from the election. In addition, the availability of a write-in provides voters who hold dissenting opinions an opportunity to express their preferences. (See *ante,* at pp. 715-717.) Once again, respondents have not demonstrated that a total ban on write-in voting in the general election is necessary to achieve the city's purposes.

If San Diego's councilmanic election system results in dilution of the minority vote, or discrimination against minority voters or candidates, it will be subject to attack under the Voting Rights Act of 1965, section 2, as amended, 42 United States Code Annotated section 1973.[18] At this stage, the record contains no evidence of abuse. Respondents' speculative arguments about the possible consequences of allowing write-in voting do not justify burdening the right to vote. The record in this case does demonstrate the detrimental consequences of a prohibition on write-in voting. If discrimination or abuse occurs, San Diego may have to revise its councilmanic election scheme to satisfy constitutional and statutory requirements.[19]

---

[18]Section 2, as amended in 1982, prohibits a voting scheme which *results* in the dilution of the minority vote. If dilution of the vote is found to be *purposeful,* the scheme also violates the 14th and 15th Amendments to the United States Constitution. (See *Mobile* v. *Bolden* (1980) 446 U.S. 55 [64 L.Ed.2d 47, 100 S.Ct. 1490]; *Velasquez* v. *City of Abilene, Tex.* (5th Cir. 1984) 725 F.2d 1017, 1021.)

At-large city council elections have been challenged repeatedly as violative of the 14th and 15th Amendments and the Voting Rights Act, with varied results. (See, e.g., *Mobile* v. *Bolden, supra,* 446 U.S. 55; *Jones* v. *City of Lubbock* (5th Cir. 1984) 727 F.2d 364; *Velasquez, supra,* 725 F.2d 1017; *Overton* v. *City of Austin* (5th Cir. 1984) 748 F.2d 941; *Aranda* v. *Van Sickle* (9th Cir. 1979) 600 F.2d 1267; see also, Berry & Dye, *The Discriminatory Effects of At-Large Elections* (1979) 7 Fla.St.U. L.Rev. 85 [study found that "an at-large election is the single most important variable in explaining black underrepresentation on city councils" (*id.,* at p. 121)].)

[19]The city made a similar adjustment when it enacted new residency requirements to supersede the original requirements set out in the city charter, after the latter were "impliedly rendered invalid by *Johnson* v. *Hamilton, [supra,]* 15 Cal.3d 461 . . . ." (San Diego Mun. Code, § 27.2023.)

A balancing of the rights of the candidates and voters against the interests asserted by respondents leads to the conclusion that San Diego's prohibition on write-in voting is unconstitutional. A ban on write-in voting burdens the right to be a candidate for public office and the fundamental right to vote for the candidate of one's choice. None of the justifications posited by the city is sufficient to outweigh the injury to these constitutional rights. Further, a ban on write-in voting is not the least restrictive alternative available to achieve the city's goals.

The determination that San Diego's prohibition on write-in voting is unconstitutional is supported by the decisions of other jurisdictions. A limited number of courts have examined the status of write-in voting under the federal Constitution. The most comprehensive analysis was undertaken by the federal district court in *Socialist Labor Party* v. *Rhodes, supra,* 290 F.Supp. 983. In that case, the court was faced with an Ohio statute which provided that write-in voting was prohibited in general elections except for offices for which no candidates had been nominated. The Socialist Labor Party sought an order requiring the state to provide a space on the presidential election ballot for write-in votes.[20]

In addressing the plaintiff's claims, the district court reviewed Supreme Court precedent which had emphasized the fundamental nature of the right to vote. (*Socialist Labor Party, supra,* 290 F.Supp. at pp. 986-987.) The court noted specifically that the right to vote included the right " 'to vote freely for the candidate of one's choice' " (*id.,* at p. 987), and held that "[a] blanket prohibition against the use of write-in ballots denies the qualified electors of Ohio the right to freely participate in the electoral process as guaranteed by the Constitution . . . ." (*Ibid.*)[21]

In *Kamins* v. *Board of Elections, District of Columbia* (D.C.App. 1974) 324 A.2d 187, another court construed a federal election code provision which did not mention write-in voting so as to permit that practice. "[W]e do not believe Congress intended otherwise valid votes to be disregarded merely for the reason that a time-honored method of political expression had not been mentioned in the statute nor provided for by regulation. The fundamental nature of the right involved persuades us that construction of

---

[20]The plaintiffs in *Socialist Labor Party* also challenged several other provisions of the Ohio election laws which effectively prevented independent candidates and parties from gaining access to the ballot. (*Socialist Labor Party, supra,* 290 F.Supp. at pp. 985-986.) Thus, the prohibition on write-in voting at issue in the case was but one aspect of a much more restrictive scheme than is in effect in San Diego. (See *ante,* p. 719, fn. 15.)

[21]The validity of the prohibition on write-in voting was not appealed to the United States Supreme Court. In *Williams* v. *Rhodes, supra,* 393 U.S. 23, the high court invalidated other restrictive provisions of Ohio's election scheme.

the statute in favor of the franchise is the course which we must follow since there is no compelling reason to do otherwise. . . . [¶] 'A write-in ballot permits a voter to effectively exercise his individually constitutionally protected franchise.' " (*Id.*, at pp. 192-194.)

In *Thompson* v. *Willson, supra,* 155 S.E.2d 401, the Georgia Supreme Court struck down a statutory provision which prohibited write-in voting. "[N]o matter what procedure is required for getting the names of candidates on the ballot, the individual elector has the unshackled right to write on the ballot any person he wishes to vote for, and can not [*sic*] be restricted to a choice between those whose names are provided on the ballot." (*Id.*, at p. 404.) While the court relied primarily on the Georgia Constitution, it also invoked the protection of the federal Constitution. (*Ibid.*)[22]

The limited California precedent on the issue accords with this view. In *Cohn* v. *Isensee, supra,* 45 Cal.App.531, the Court of Appeal construed a section of the Political Code to require space on the ballot for write-in voting in order to avoid invalidation of the statute on constitutional grounds. Speaking in broad terms, the court held that "[i]f . . . the ballots that are required to be used at a recall election have no blank space wherein the voter may write the name of a person whose name is not printed on the ballot, the voter must be compelled to vote for the person or persons whose

---

[22]See also *Wright* v. *Richter* (D.Del. 1969) 301 F.Supp. 1345, in which the court abstained from ruling on the validity of a prohibition on write-in voting in order to "avoid[] a premature and perhaps unnecessary federal constitutional question." (*Id.*, at p. 1349.) The court preferred to let Delaware's state courts address the issue, noting that most states have held such a ban to be unconstitutional under their state constitutions. (*Id.*, at pp. 1347-1348.)

Some state courts which have addressed the issue have held that a prohibition on write-in voting contravenes their state constitutions. (See, e.g., *Smith* v. *Smathers* (Fla. 1979) 372 So.2d 427; *Jackson* v. *Norris* (1937) 173 Md. 579 [195 A. 576] [but see *Board of Sup'rs* v. *Blunt* (1952) 200 Md. 120 [88 A.2d 474], restricting the holding in *Jackson* to general elections]; *Lacombe* v. *Laborde* (1912) 132 La. 435 [61 So. 518]; *Littlejohn* v. *People* (1912) 52 Colo. 217 [121 P. 159].) Other courts have construed statutes which were silent on the issue to allow write-in voting to avoid constitutional difficulties. (See, e.g., *Ubelhor* v. *George* (1967) 248 Ind. 330 [227 N.E.2d 443]; *Howell* v. *Bain* (1945) 176 Ore. 187 [156 P.2d 576]; *Barr* v. *Cardell* (1915) 173 Iowa 18 [155 N.W. 312]; *Mayor, etc., City of Jackson* v. *State* (1912) 102 Miss. 663 [59 So. 873]; *Park* v. *Rives* (1911) 40 Utah 47 [119 P. 1034]; *Riter* v. *Douglass* (1910) 32 Nev. 400 [109 P. 444]; *Snortum* v. *Homme* (1909) 106 Minn. 464 [119 N.W. 59]; *Sanner* v. *Patton* (1895) 155 Ill. 553 [40 N.E. 290]; *Bowers* v. *Smith* (1892) 111 Mo. 45 [20 S.W. 101].) In addition, many courts have expressed in dicta that voters have the constitutional right to write-in the candidates of their choice. (See, e.g., *Shields* v. *Toronto* (1964) 16 Utah 2d 61 [395 P.2d 829]; *McCoy* v. *Fisher* (1951) 136 W.Va. 447 [67 S.E.2d 543, 553]; *Roberts* v. *Cleveland* (1944) 48 N.M. 226 [149 P.2d 120, 153 A.L.R. 635]; *Asher* v. *Arnett* (1939) 280 Ky. 347 [132 S.W.2d 772]; *Wescott* v. *Scull* (N.J. 1915) 96 A. 407; *People* v. *McCormick* (1913) 261 Ill. 413 [103 N.E. 1053]; *Hopper* v. *Britt* (1911) 203 N.Y. 144 [96 N.E. 371]; *Oughton* v. *Black* (1905) 212 Pa. 1 [61 A. 346]; *State* ex rel. *Runge* v. *Anderson* (1898) 100 Wis. 523 [76 N.W. 482]; *Cole* v. *Tucker* (1895) 164 Mass. 486 [41 N.E. 681]; *De Walt* v. *Bartley* (1892) 146 Pa. 529 [24 A. 185]; *People* ex rel. *Bradley* v. *Shaw* (1892) 133 N.Y. 493 [31 N.E. 512].)

name or names may be printed on the ballot furnished him, or be deprived of the privilege of voting for any person whatever. . . . [¶] If the narrow construction of this act that respondent contends for be the only permissible construction, the voter is deprived of his constitutional right of suffrage— deprived of the right of exercising his own choice; and where that right is taken away, there is nothing left worthy to be called the right of suffrage— the boasted free ballot becomes a delusion." (*Id.*, at pp. 538-539.)

In *Binns* v. *Hite* (1964) 61 Cal.2d 107 [37 Cal.Rptr. 323, 389 P.2d 947], this court addressed the constitutionality of an Elections Code provision which provided that, in certain circumstances, if only the incumbent municipal court judge had filed nomination papers 45 days prior to the general election, the incumbent would be declared reelected and would not appear on the ballot. The provision was challenged on the ground that it abridged the constitutional right to write-in voting.

In upholding the statute, the court disapproved the broad language of *Cohn* v. *Isensee, supra,* 45 Cal.App. 531. (*Binns* v. *Hite, supra,* 61 Cal.2d at p. 112.) However, it noted that it was "not confronted . . . with an attempt by the Legislature to abolish write-in votes but rather with a statute regulating the use of such votes . . . ." (*Id.*, at p. 111.) The court stressed the need to simplify what might otherwise be an "unduly long and confusing ballot," since the only jurisdiction to which the section applied had 49 municipal judges. (*Id.*, at pp. 112-113.)[23]

Further, the procedure took effect only if a write-in candidate did not file a petition signed by 100 registered voters not less than 45 days before the general election. The court concluded that "[w]hen the necessity of accomplishing the purposes underlying [the section] is weighed against the comparatively slight burdens imposed upon electors who desire to have an incumbent candidate subjected to a write-in vote, we are of the view that the statute is within the bounds of the Legislature's power . . . ." (*Id.*, at p. 112; see also *Barrett* v. *Hite, supra,* 61 Cal.2d at p. 106.) Eliminating " 'uncontested judgeships' " from the ballot "direct[s] attention to contested offices, [] avoid[s] confusion, [and] reduce[s] the length of the ballot and costs of elections . . . ." (*Barrett* v. *Hite, supra,* 61 Cal.2d at p. 106; see also *Binns* v. *Hite, supra,* 61 Cal.2d at p. 112.) These may be sufficiently

---

[23]The potential for confusion is significant. In 1962, a constitutional amendment established that the names of unopposed incumbent superior court judges in Los Angeles County, the state's most populous county, need not be placed on the ballot. The ballot pamphlet argument in support of the constitutional amendment noted that in a previous election "the voters were forced to search through 65 uncontested judicial elections in order to find the three offices for which there was a contest." (*Barrett* v. *Hite* (1964) 61 Cal.2d 103, 106 [37 Cal.Rptr. 320, 389 P.2d 944].)

compelling reasons to uphold the limitations in the context of local judicial elections in spite of the burden imposed on the right to vote.

No such special considerations apply in this case. Unlike the provision in *Binns*, the San Diego statute does not attempt to address the problem of an overly long and confusing ballot. Nor is San Diego's requirement that a candidate file over five months before the general election comparable to the forty-five-day deadline in *Binns*.

Moreover, San Diego's ordinance is a direct, intentional "attempt . . . to abolish write-in votes" (*Binns* v. *Hite, supra,* 61 Cal.2d at p. 111), a situation not confronted by the court in *Binns*. There, the state's interests were weighed against the burdens imposed. The court found the asserted interests to justify the burdens. (*Id.,* at p. 112.) When San Diego's asserted interests are weighed against the burdens imposed on the voters' fundamental rights, the balance tips overwhelmingly in favor of protecting the voters' rights.

### III.

The right to seek public office and the right to the unrestricted exercise of the franchise are fundamental. They are protected by the First Amendment and article I, section 2 of the California Constitution. San Diego's prohibition on write-in voting impermissibly restricts the exercise of those rights. Not only does the ban prevent voters from casting their ballots for the candidates of their choice, it renders the election process *too* restrictive. The ban may stifle political association and expression during the election season and leave the voters without meaningful options on election day. Accordingly, this court holds that San Diego's prohibition on write-in voting in municipal general elections contravenes the state and federal Constitutions.

The alternative writ, having served its purpose, is discharged, and the petition for peremptory writ is denied. (*United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902, 906, 914 [122 Cal.Rptr. 877, 537 P.2d 1237]; *Ramirez* v. *Brown* (1973) 9 Cal.3d 199, 203, 217 [107 Cal.Rptr. 137, 507 P.2d 1345]; *Zeilenga* v. *Nelson, supra,* 4 Cal.3d at p. 724.) Petitioners shall recover costs herein.

Mosk, J., Broussard, J., and Kaus, J.,* concurred.

**GRODIN, J.**—I concur in the judgment and in the reasoning of the majority opinion as it pertains to elections for mayor and other individually elected

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

officers. That is the only question we are called upon to decide. I would reserve judgment as to the validity of the write-in prohibition as it pertains to San Diego's quasi-district scheme for city council elections. Such elections may pose different issues (*ante,* pp. 722-723), best resolved in a case in which they have been raised in the trial court and briefed on appeal.

Reynoso, J., concurred.

**LUCAS, J.**—I respectfully dissent.

The issue that the majority should have confronted is whether San Diego's ban on write-in candidates and write-in voting has "a 'real and appreciable impact' upon the equality, fairness and integrity of the electoral process. [Citation.]" (*Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438].) Only regulations with such impact should be subjected to strict scrutiny. (*Ibid.*) In my view, San Diego's ordinance is nondiscriminatory and places a de minimis burden on the electoral process.

For a discussion of the appropriate equal protection analysis of this ordinance, I adopt as my view the analysis of the Court of Appeal, Fourth Appellate District, written by Acting Presiding Justice Wiener and concurred in by Justice Work and Justice Butler. That opinion follows, with appropriate additions and deletions:*

[] [I] begin with the premise that in our form of government, the right to vote is fundamental and essential. While the right is not expressly protected by the United States Constitution (*Rodriguez* v. *Popular Democratic Party* (1982) 457 U.S. 1, 9 [72 L.Ed.2d 628, 635, 102 S.Ct. 2194]), the United States Supreme Court has repeatedly made clear "that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." (*Dunn* v. *Blumstein* (1972) 405 U.S. 330, 336 [31 L.Ed.2d 274, 280, 92 S.Ct. 995].)

Of course, the San Diego ordinance at issue here does not directly restrict anyone's right to vote. Rather, it regulates the manner in which persons may become candidates for elected municipal offices. Nonetheless, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." (*Bullock* v. *Carter* (1972) 405 U.S. 134, 143 [31 L.Ed.2d 92, 99, 92 S.Ct. 849].) It is thus not surprising that this cor-

---

*Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions. (*Estate of McDill* (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874].)

relation has figured prominently in a series of United States Supreme Court cases which have applied the strict scrutiny test in invalidating restrictions on persons who sought to be candidates for public office. (See *Illinois Elections Bd.* v. *Socialist Workers Party* (1979) 440 U.S. 173, 184 [59 L.Ed.2d 230, 240, 99 S.Ct. 983]; *Lubin* v. *Panish* (1974) 415 U.S. 709, 716 [39 L.Ed.2d 702, 708, 94 S.Ct. 1315]; *Bullock* v. *Carter, supra,* 405 U.S. at pp. 142-144 [31 L.Ed.2d at pp. 99-100]; *Williams* v. *Rhodes* (1968) 393 U.S. 23, 31 [21 L.Ed.2d 24, 31-32, 89 S.Ct. 5]; see also *Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 468-469 [125 Cal.Rptr. 129, 541 P.2d 881].)

That the court has viewed strict scrutiny as the appropriate standard to be applied in these cases is reasonably clear. What operative facts in each case trigger that standard is more opaque. In *Bullock* v. *Carter,* for instance, the court reviewed a filing fee requirement for candidates in Texas elections. The choice-of-standard problem was described as follows: "[N]ot every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. *McDonald* v. *Board of Election,* 394 U.S. 802 (1969). Texas does not place a condition on the exercise of the right to vote, nor does it quantitatively dilute votes that have been cast. Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. The existence of such barriers does not of itself compel close scrutiny. Compare *Jenness* v. *Fortson,* 403 U.S. 431 (1971), with *Williams* v. *Rhodes,* 393 U.S. 23 (1968). In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." (405 U.S. at p. 143 [31 L.Ed.2d at pp. 99-100], fns. omitted.) The court in *Bullock* goes on to conclude that the Texas filing fee requirement had "a real and appreciable impact on the exercise of the franchise" (*id.,* at p. 144 [31 L.Ed.2d at p. 100]), thus triggering the stricter standard of review.

Unfortunately, neither *Bullock* nor any subsequent United States Supreme Court case has analyzed "the degree to which a particular regulation affects the right to vote . . . ." (*Libertarian Party* v. *Eu* (1980) 28 Cal.3d 535, 543 [170 Cal.Rptr. 25, 620 P.2d 612].) Nonetheless, California appellate courts have generally attempted to apply the *Bullock* formulation in evaluating candidate restrictions to determine whether the challenged regulation has a "real and appreciable impact" on the electoral process and thus must be subjected to strict scrutiny. (See *Choudhry* v. *Free* [, *supra,*] 17 Cal.3d 660, 664; *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 799 [187 Cal.Rptr. 398, 654 P.2d 168]; *Libertarian Party* v. *Eu* (1978) 83 Cal.App.3d 470, 473 [147 Cal.Rptr. 888]; *Fridley* v. *Eu* (1982) 131 Cal.App.3d 100, 104 [182 Cal.Rptr. 232].) As [we have] explained, however, "[N]ot every classification established by an 'election

law' need be subjected to this 'strict' judicial scrutiny; innumerable election provisions detailing the mechanisms of the election process may have only minimal, if any, effect on the fundamental right to vote, and classifications of this nature may properly be judged under the 'rational basis' equal protection standard." (*Gould* v. *Grubb* (1975) 14 Cal.3d 661, 670 [122 Cal.Rptr. 377, 536 P.2d 1337]; see also *Rittenband* v. *Cory* (1984) 159 Cal.App.3d 410, 421 [205 Cal.Rptr. 576].)

Historically, California courts applying the *Bullock* test have made liberal use of the strict scrutiny standard in evaluating restrictions on candidacy. (E.g., *Johnson* v. *Hamilton, supra,* 15 Cal.3d 461 (applied to candidate residency requirements); *Choudhry* v. *Free, supra,* 17 Cal.3d 660 (applied to candidate property ownership requirements); *DeBottari* v. *Melendez* (1975) 44 Cal.App.3d 910 [119 Cal.Rptr. 256] (applied to one-year restriction on recalled officials running for the same public office).) Nonetheless, this line of cases has consistently interpreted and applied federal constitutional law in resolving the equal protection issues presented. Moreover, the more recent California cases recognize that federal law in this area is unsettled and that the United States Supreme Court may be cutting back on the use of the strict scrutiny standard.[1] (See, e.g., *Choudhry* v. *Free, supra,*

---

[1]This somewhat more deferential approach to candidate restrictions may be signaled by the recent decision in *Clements* v. *Fashing* (1982) 457 U.S. 957 [73 L.Ed.2d 508, 102 S.Ct. 2836]. *Clements* concerned a challenge to two Texas constitutional provisions which prohibited a large number of public officials from running for the state legislature and which forced a more limited number to resign from their current office prior to announcing their candidacy for any other public office. The four-justice plurality opinion by Justice Rehnquist explains that the court's "ballot access" cases "focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens 'the availability of political opportunity.'" (*Id.,* at p. 964 [73 L.Ed.2d at p. 516], quoting from *Lubin* v. *Panish, supra,* 415 U.S. 709, 716 [39 L.Ed.2d 702, 708, 94 S.Ct. 1315].) The plurality goes on to categorize the two lines of ballot access cases in which the court has applied strict scrutiny principles as those involving wealth-based restrictions (e.g. *Lubin* v. *Panish, supra,* 415 U.S. 709; *Bullock* v. *Carter, supra,* 405 U.S. 134) and those which burden the First Amendment associational interests of small political parties or independent candidates (e.g., *Illinois Elections Bd.* v. *Socialist Workers Party, supra,* 440 U.S. 173; *American Party of Texas* v. *White* (1974) 415 U.S. 767; *Williams* v. *Rhodes, supra,* 393 U.S. 23). (457 U.S. at pp. 964-965 [73 L.Ed.2d at pp. 516-517].)

While not necessarily limiting the strict scrutiny analysis to only those two categories, Justice Rehnquist explained in *Clements* that the interference at issue was not significant enough to trigger the heightened review standard. (*Id.,* at pp. 967, 970 [73 L.Ed.2d at pp. 518, 520].) He noted that the Texas system did not absolutely prohibit the officials from becoming candidates for the other offices. The restrictions were viewed as "a *de minimis* burden" on the political aspirations of the affected persons because they discriminate "neither on the basis of political affiliation nor on any factor not related to a candidate's qualifications to hold political office." (*Id.,* at p. 967 [73 L.Ed.2d at p. 518].)

The two illustrative categories mentioned by the *Clements* plurality suggest that strict scrutiny is appropriate where the candidacy restriction interferes not only with the right to vote but also with some other constitutionally protected interest (e.g., association) or constitutionally questionable classification (e.g., wealth). No California court has yet had the

17 Cal.3d at p. 664; *Johnson* v. *Hamilton, supra,* 15 Cal.3d at pp. 466-468; *Fridley* v. *Eu, supra,* 131 Cal.App.3d at p. 104; *Libertarian Party* v. *Eu, supra,* 83 Cal.App.3d at pp. 472-473.)

We are thus faced with determining whether San Diego's prohibition of write-in candidates and write-in voting has a "real and appreciable impact" on the right to vote and on the "equality, fairness and integrity of the electoral process." (*Choudhry* v. *Free, supra,* 17 Cal.3d at p. 664.) In doing so, [I] recognize that the facts of this case do not fall neatly into any of the hollows carved by past decisions. Nearly all of the prior cases have considered restrictions which denied "access to the ballot altogether" (*Libertarian Party* v. *Eu, supra,* 28 Cal.3d at p. 543) to some "significant" or "identifiable class" of potential candidates. (*Thompson* v. *Mellon* (1973) 9 Cal.3d 96, 100 [107 Cal.Rptr. 20, 507 P.2d 628, 65 A.L.R.3d 1029] (opn. of Sullivan, J.); cf. *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at p. 799.) The group of persons denied access by the San Diego ordinance consists only of those individuals who decide initially not to become candidates but who later interpret changes in the political climate to have improved their chances of being elected. [I] find it difficult to characterize this as the systematic exclusion of a "significant" group.

Moreover, to the extent there is an excluded group, such persons are "identified" only by virtue of their conscious decision not to become a candidate by the normal filing deadline. The waxing and waning of a potential candidate's political enthusiasm in an otherwise open political system can hardly be equated with the less mutable characteristics which have defined the excluded groups in past cases. (Compare *Choudhry* v. *Free, supra,* 17 Cal.3d 660 (defined by property ownership); *Johnson* v. *Hamilton, supra,* 15 Cal.3d 461 (defined by residency); *Knoll* v. *Davidson* (1974) 12 Cal.3d 335 [116 Cal.Rptr. 97, 525 P.2d 1273] (defined by ability to pay);

---

opportunity to comment on the *Clements* analysis, although some language in prior cases suggests a tension with Justice Rehnquist's rationale. (See, e.g. *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at p. 799 ("[I]t is the impact of the classification on the electoral process that triggers strict scrutiny. That heightened mode of analysis is not limited to cases involving suspect or invidious classifications"); see also *Bay Area Women's Coalition* v. *City and County of San Francisco* (1978) 78 Cal.App.3d 961, 967 [144 Cal.Rptr. 591].)

[I] perceive that the *Clements* plurality would apply the rational basis test in evaluating the San Diego ordinance prohibiting write-in voting because such ordinance implicates no additional constitutionally protected class or value. In view of [my] conclusion that strict scrutiny is inapplicable even under existing California precedent because the challenged San Diego scheme has no "real and appreciable impact" on the fairness and integrity of the voting process, [I] need not address the difficult questions of the extent to which the *Clements* plurality represents the view of the Court and, if so, whether the equal protection provisions of [the] California Constitution compel a different analysis.

*Libertarian Party* v. *Eu, supra,* 83 Cal.App.3d 470 (defined by party affiliation).) The San Diego system is thus, in a very real sense, nondiscriminatory in nature: Anyone can become a candidate if filing deadlines are complied with; if they are not, everyone is subject to the same prohibition against becoming a write-in candidate. (See *Green* v. *Layton* (1975) 14 Cal.3d 922, 928 [123 Cal.Rptr. 97, 538 P.2d 225].)

A recent case employed similar reasoning in holding that the lack of an appreciable impact justified application of the rational basis test in evaluating a candidacy restriction. In *Fridley* v. *Eu, supra,* 131 Cal.App.3d 100, a state statute effectively precluded use of the write-in process by candidates seeking a minor party's nomination in the party primary process.[2] The court concluded that the statute "does not have an appreciable impact upon the right to vote" because the statutory scheme "afforded all candidates access to the ballot by the 'simple expedient of filing nomination papers.'" (*Id.,* at p. 104, quoting *Blair* v. *Hebl* (W.D.Wis. 1980) 498 F.Supp. 756, 761.) Thus, even if the write-in procedure were unavailable, the alternate means of obtaining ballot access meant that the statutory restriction did not significantly affect the choices available to voters. (Compare *Lubin* v. *Panish, supra,* 415 U.S. at p. 716 [39 L.Ed.2d at p. 708].) Under such circumstances, the statute need only be "rationally related to a legitimate state interest."[3] (*Fridley, supra,* 131 Cal.App.3d at pp. 104-105.)

Having determined that the San Diego scheme must be evaluated using the more deferential branch of the two-tiered equal protection rubric (see generally *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at pp. 798-799), [I] must now evaluate the governmental interests asserted by San Diego in support of its total prohibition against write-in candidacy and write-in voting.[]

---

[2]The restriction challenged in *Fridley* was the statutory requirement that in order for a write-in who wins a primary election to have his name placed on the general election ballot, he must have received at least 1 percent of the total number of votes cast in the last general election for the office he seeks. Mr. Fridley, a member of the Libertarian Party, won that party's primary for the office of state assemblyman in the 22d District. The statute in question made it impossible for him to appear on the general election ballot because the total number of registered Libertarian voters in the 22d District did not equal 1 percent of the votes cast in the previous general election for the assembly seat.

[3]The *Fridley* court was correct in its conclusion that the minimal impact of the statutory restriction on the choices available to voters justified application of the rational basis test. Furthermore, the state undoubtedly has a legitimate interest in assuring that a write-in candidate does not merely take advantage of a situation where no one appears on the primary ballot (131 Cal.App.3d at p. 105), but in fact demonstrates a significant level of support "among that party's electorate" (*ibid.*). If the result in *Fridley* can be questioned, it is only because the requirement used to gauge support—1 percent of *all* votes cast for that office at the last general election—has little relationship to the amount of support possessed by the write-in candidate *within his party*. (Compare *Blair* v. *Hebl, supra,* 498 F.Supp. 756 (level of support requirement for write-in candidates in primary election tied to number of votes received by *that party's* gubernatorial candidate in the last general election).)

Where nonpartisan offices—such as those involved in San Diego municipal elections—are concerned, the clear purpose of the primary election is to narrow the field of candidates to two so that the winner of the general election is assured of having the support of a majority of the voters. (Cf. *Storer* v. *Brown, supra,* 415 U.S. at p. 735 [39 L.Ed.2d at p. 726].) The United States Supreme Court has recognized this as a permissible if not significant governmental interest. (*Williams* v. *Rhodes, supra,* 393 U.S. at p. 32 [21 L.Ed.2d at p. 32].) Were write-in voting permitted in the general election, the winner might receive significantly less than 50 percent of the vote.[4] Accordingly, [I] believe that San Diego's prohibition of write-in voting at the general election is reasonably related to a legitimate governmental interest.[] [End of Court of Appeal opinion.]

I would hold that San Diego's prohibition against write-in voting in municipal general elections is constitutional.

---

[4]In fact, unsuccessful candidates at the primary election could simply continue their campaigns as write-ins at the general election.